# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2019AP447-CR |

| | |
|---|---|
| COMPLETE TITLE: | State of Wisconsin,<br>　　　　Plaintiff-Respondent,<br>　　v.<br>Heather Jan VanBeek,<br>　　　　Defendant-Appellant. |

ON CERTIFICATION FROM THE COURT OF APPEALS

| | |
|---|---|
| OPINION FILED: | June 4, 2021 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | February 23, 2021 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Sheboygan |
| JUDGE: | Kent R. Hoffman |

JUSTICES:

ROGGENSACK, J., delivered the majority opinion of the Court with respect to ¶¶22-35 and ¶¶46-65, in which ANN WALSH BRADLEY, DALLET, and KAROFSKY, JJ., joined, and an opinion with respect to ¶¶1-21, ¶¶36-45, and ¶66. DALLET, J., filed a concurring opinion, in which ANN WALSH BRADLEY and KAROFSKY, JJ., joined. ZIEGLER, C.J., filed a dissenting opinion, in which REBECCA GRASSL BRADLEY and HAGEDORN, JJ., joined.
NOT PARTICIPATING:

ATTORNEYS:

For the defendant-appellant, there were briefs filed by *Jay Pucek*, assistant state public defender. There was an oral argument by *Jay Pucek*.

For the plaintiff-respondent, there was a brief filed by *Scott E. Rosenow*, assistant attorney general; with whom on the brief was *Joshua L. Kaul*, attorney general. There was an oral argument by *Scott E. Rosenow*.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No.2019AP447-CR
(L.C. No. 2017CF720)

STATE OF WISCONSIN : IN SUPREME COURT

**State of Wisconsin,**

    **Plaintiff-Respondent,**

    **v.**

**Heather Jan VanBeek,**

    **Defendant-Appellant.**

**FILED**

**JUN 4, 2021**

Sheila T. Reiff
Clerk of Supreme Court

---

ROGGENSACK, J., delivered the majority opinion of the Court with respect to ¶¶22-35 and ¶¶46-65, in which ANN WALSH BRADLEY, DALLET, and KAROFSKY, JJ., joined, and an opinion with respect to ¶¶1-21, ¶¶36-45, and ¶66. DALLET, J., filed a concurring opinion, in which ANN WALSH BRADLEY and KAROFSKY, JJ., joined. ZIEGLER, C.J., filed a dissenting opinion, in which REBECCA GRASSL BRADLEY and HAGEDORN, JJ., joined.

---

APPEAL from a judgment and an order of the Circuit Court for Sheboygan County. *Reversed and cause remanded.*

¶1 PATIENCE DRAKE ROGGENSACK, J. This case is before us on certification from the court of appeals[1] pursuant to Wis. Stat. § (Rule) 809.61 (2019-20).[2] The court of appeals certified

---

[1] State v. VanBeek, No. 2019AP447-CR, certification (Wis. Ct. App. Aug. 12, 2020).

[2] All subsequent references to the Wisconsin Statutes are to

(continued)

the following question: "whether a consensual encounter becomes an unconstitutional seizure under the Fourth Amendment when an officer requests and takes an individual's driver's license to the officer's squad car without reasonable suspicion." Accordingly, we review the Circuit Court of Sheboygan County's[3] judgment of conviction of Heather VanBeek for possession of methamphetamine and drug paraphernalia. VanBeek's conviction arose from a search of her vehicle that she contends violated her right to be free from unreasonable searches and seizures under the Fourth Amendment to the United States Constitution.

¶2 On the certified question, we conclude that the answer depends on the totality of circumstances surrounding an encounter. Further, while VanBeek was not seized when Officer Oetzel took her driver's license to run a records check, VanBeek was seized when Oetzel returned to her vehicle, withheld her driver's license and continued to question her and her passenger in order to hold her until a drug-sniff dog, i.e., the K9 unit, that he had requested arrived. Finally, we conclude that the seizure was unlawful because, based on the totality of circumstances, Oetzel did not have reasonable suspicion that VanBeek was engaged in criminal activity at the time he seized her. Accordingly, we reverse the circuit court's judgment of

---

the 2019-20 version unless otherwise indicated.

[3] The Honorable Kent Hoffman of Sheboygan County presided.

conviction and remand with instruction to grant VanBeek's motion to suppress.

I.  BACKGROUND

A.  Factual Background

¶3  On the night of November 12, 2017, the City of Sheboygan Police Department received an anonymous call that a truck, with two occupants, had been sitting near the intersection of 6th Street and Superior Avenue in Sheboygan for approximately an hour.  The caller also stated that a person approached the truck with a backpack and left later without it. The caller provided no description of the truck.

¶4  Sheboygan Police Officer Sung Oetzel responded to the call.  When he arrived, Oetzel saw only one truck in the location that had been identified.  However, to be sure it was the truck to which the caller referred, he quickly drove around the area and confirmed there was only one truck with two occupants nearby.  Oetzel parked his squad car behind the truck and activated his squad car's spotlight.[4]

¶5  VanBeek and her passenger, Branden Sitzberger, were sitting in VanBeek's truck when Oetzel approached.  Oetzel made contact with VanBeek, saying that "someone called in, suspicious that two people were just sitting here."[5]  VanBeek responded that

---

[4] He did not activate his squad car's red and blue emergency lights.

[5] The entire interaction between VanBeek and Oetzel was recorded on Oetzel's body camera.

she was "waiting for [Sitzberger] to walk." Sitzberger similarly stated that VanBeek had just picked him up. Oetzel informed VanBeek that the caller said VanBeek had been sitting there for an hour, which VanBeek denied. Sitzberger said it had been "about ten minutes." Oetzel responded by saying "it was an anonymous caller, you know how people exaggerate sometimes. I don't know." VanBeek answered affirmatively when Oetzel asked if Sitzberger was her boyfriend and if she was "just waiting"; Oetzel responded "sounds legit." During his initial encounter with VanBeek, Oetzel did not ask about a backpack or a third person that the caller had mentioned. There is nothing in the record to show whether such a person had been present.

¶6 Oetzel then asked VanBeek and Sitzberger for their information "for his report, so [he] [could] just get out of [here]." Sitzberger asked if Oetzel was going to just write down the information. Oetzel told Sitzberger he wanted their "IDs" so he could "compare faces." While VanBeek and Sitzberger were giving their driver's licenses to Oetzel, Oetzel asked what they were doing that night, and Sitzberger responded that VanBeek had just picked him up and they were going back to Cascade. Oetzel took possession of their driver's licenses and said "Okay. I'll be right back, okay." VanBeek and Sitzberger replied "alright."

¶7 Before returning to his squad car, Oetzel spoke to another officer who had arrived on scene. Oetzel told the other officer that VanBeek said she was "waiting for her boyfriend" and "[he] [didn't] think it [was] anything suspicious." When he

4

ran a records check on VanBeek and Sitzberger, Oetzel discovered that neither person had outstanding warrants. However, Oetzel learned that VanBeek had overdosed in February of that year and that Sitzberger was on supervision. Based on these two additional facts, Oetzel called for the K9 unit. Oetzel then exited his squad car and once again spoke to the other officer who was on scene. As he returned to VanBeek's vehicle, Oetzel asked the other officer if he "had enough to just hold them until [the K9 unit] [got] [there]."

¶8 After he returned to VanBeek's vehicle, while retaining possession of their driver's licenses, Oetzel asked VanBeek and Sitzberger numerous questions, some of which he had already asked and they had answered. For example, Oetzel asked VanBeek to confirm that she lived in Cascade, to repeat her address, to confirm her date of birth, and to provide a phone number. As Oetzel questioned her, VanBeek asked whether her "license was bad." Oetzel answered no, and she answered Oetzel's questions. After questioning VanBeek, Oetzel moved on to Sitzberger, asking him to confirm his address and for a phone number. Sitzberger also complied.

¶9 While retaining their driver's licenses, Oetzel continued his questioning, saying "Heather, you were saying that you were picking him up. I thought you [Sitzberger] said you live here." Sitzberger denied saying that he lived in the area and that he was at a friend's house. Oetzel asked, "which friend?" and Sitzberger responded with the name "Jake" who he said lived "a couple blocks down." Oetzel asked whether Jake

5

lived on Superior, and Sitzberger responded affirmatively, though he seemed unsure whether Jake lived at 7th or 8th street. Sitzberger said that he thought VanBeek was outside but did not see her, so he called her and walked around trying to find her.

¶10 Oetzel then asked Sitzberger more questions about Jake, including where exactly on Superior Jake lived, for Jake's full name, and for Jake's phone number. Oetzel told Sitzberger that he "just want[ed] to verify [Sitzberger's] story" because Sitzberger was on supervision. He "wanted to confirm that there [was] a Jake there so that [Sitzberger] wasn't lying to [him]." Sitzberger offered to call Jake, but Oetzel told Sitzberger that he would rather "have the phone number and [he] can call [Jake] himself." After taking Jake's phone number down, Oetzel asked Sitzberger if Sitzberger had been drinking. Sitzberger said that he had not. Oetzel said that he asked because Sitzberger's face was "a little red" and Sitzberger replied saying he "just got done walking" and that it was hot in the truck. Oetzel then returned to questioning Sitzberger about Jake.

¶11 This time, the questions included how Sitzberger knew Jake and how long he had known him. Sitzberger responded, telling Oetzel that he met Jake through a friend and that he had known Jake for about five or six months. After taking down that information, Oetzel circled back to his original questions and asked VanBeek and Sitzberger how long they had been sitting there. VanBeek said that up to that point she had been there for "probably an hour." She clarified that before Oetzel arrived she was there for half an hour. Oetzel exclaimed that

6

an hour is "a long time" and asked if she had been sitting there alone for awhile, which VanBeek responded to affirmatively. Shortly thereafter, the K9 unit arrived, and Oetzel asked VanBeek and Sitzberger to exit the truck.

¶12 After VanBeek and Sitzberger got out of the truck, the K9 unit conducted a sweep of the truck and the dog alerted, indicating there were drugs present. Oetzel and another officer searched the truck and discovered one gram of methamphetamine and a pipe, for which they arrested VanBeek. The entire incident lasted approximately 25 minutes.

## B. Procedural History

¶13 The State charged VanBeek with one count of Possession of Methamphetamine, contrary to Wis. Stat. § 961.41(3g)(g), and one count of Possession of Drug Paraphernalia, contrary to Wis. Stat. § 961.573(1). VanBeek moved to suppress the methamphetamine and drug pipe found during the search.

¶14 In her suppression motion, VanBeek contended that Oetzel's initial contact with her was unlawful, and, even if it were not, the stop was extended beyond its initial mission without reasonable suspicion that she or Sitzberger were committing, had committed or were about to commit a crime. She argued that Oetzel's extended questioning while retaining her driver's license violated her right to be free from unreasonable searches and seizures as guaranteed by both the Fourth Amendment to the United States Constitution and Article I, Section 11 of the Wisconsin Constitution.

¶15 The circuit court held two hearings on VanBeek's motion to suppress where the court heard testimony from Oetzel. On direct examination, Oetzel testified that he was dispatched to the intersection based on an anonymous call, but "the description of the vehicle was not provided by the anonymous caller so [he] went further south" to see if any other vehicles were sitting idle with two occupants.

¶16 Oetzel confirmed that he did not know why Sitzberger was on supervision and that he "didn't ask dispatch." On cross-examination, Oetzel gave conflicting testimony on whether he mentioned the anonymous caller's information regarding a third person or a backpack during the initial encounter. First, Oetzel said that he "[couldn't] recall" whether he mentioned the backpack. A few moments later, he stated that "[he] told them why [he] was there with the suspicious complaint about two individuals being inside a vehicle, a truck, and that [an] unknown person approached them with a backpack." The bodycam footage confirms that Oetzel did not mention the backpack at any point during the interaction. And Oetzel further confirmed this on re-cross examination.

¶17 Oetzel also confirmed that he did not have reasonable suspicion at the time that he took VanBeek's and Sitzberger's driver's licenses back to his squad car. Finally, Oetzel confirmed that VanBeek had not committed any traffic violations and that he did not see or smell any indications of drug use.

¶18 In analyzing VanBeek's motion to suppress, the circuit court noted that it was required to "judg[e] the reasonableness

8

of a stop and search [and] . . . to look at the totality of circumstances of the situation." The circuit court concluded that "the initial contact with [VanBeek's] vehicle was reasonable and that . . . the entire contact with the defendant and the passenger was reasonable under a totality of the circumstances."[6] This led the circuit court to conclude that the K9 search was also reasonable. Accordingly, the circuit court denied VanBeek's motion to suppress.

¶19 VanBeek pled no contest, and the circuit court subsequently entered a judgment of conviction. VanBeek appealed to the court of appeals, where she argued that "Oetzel's demand for and retention of [her] driver's license transformed his contact with her into a seizure." VanBeek contended that "no reasonable person would feel free to leave and go about his or her business once a police officer takes and retains their driver's license." Accordingly, VanBeek contended that she was seized when Oetzel took her and Sitzberger's driver's licenses back to his squad car. VanBeek further asserted that the seizure was not justified by reasonable suspicion or the

---

[6] The circuit court concluded that the initial approach "probably" was justified under the community caretaker doctrine. VanBeek's trial counsel asked for clarification on this point, and the court stated that "[i]f you look at the standards it clearly is a seizure, you know, because he approaches the vehicle, and I think it was a bona fide community caretaker activity as the state laid out[.]" The court also found that the initial contact was "a valid investigative stop . . . under the community caretaker [doctrine]." The court further concluded that the secondary contact was valid under both the community caretaker doctrine and based on reasonable suspicion.

community caretaker doctrine and that, even if the initial interaction was valid, the extension of the stop to wait for the K9 unit was not.

¶20 The State countered, arguing that "Oetzel first seized VanBeek when he asked her to exit her truck right before the dog sniff occurred." The State disagreed with VanBeek's position that she was seized when Oetzel took her driver's license back to his squad car. The State argued that per our holding in State v. Floyd, 2017 WI 78, 377 Wis. 2d 394, 898 N.W.2d 560, Oetzel's retention of VanBeek's license was not a seizure and rather, "[Oetzel] did not attempt to restrict [VanBeek's] movement until" he asked her to step out of her vehicle. Alternatively, the State argued that the earliest Oetzel seized VanBeek was during his second interaction. In either event, the State maintained that Oetzel had reasonable suspicion for the seizure.

¶21 After reviewing Fourth Amendment jurisprudence as it relates to VanBeek's contentions, the court of appeals certified an issue to us in regard to Oetzel taking VanBeek's driver's license to his squad car without reasonable suspicion. The court of appeals reasoned that "[t]his case presents an important issue that arises when officers investigate citizen complaints that are not, as yet, supported by reasonable suspicion to believe crime is afoot." The court of appeals also sought further clarification on the following statement from Floyd: "If an officer withholds a person's documents, there is good reason to believe that the person was not 'free to leave'

10

at that time." Id., ¶31. We accepted the court of appeals' certification.[7]

## II. DISCUSSION

### A. Standard of Review

¶22 Whether evidence should have been suppressed is a question of constitutional fact. State v. Coffee, 2020 WI 53, ¶19, 391 Wis. 2d 831, 943 N.W.2d 845. We "employ a two-step inquiry" to make that determination. Id. First, we uphold a circuit court's findings of historic fact unless they are clearly erroneous. Id., ¶20. Second, we independently and objectively examine the facts known to the officer at the time of the alleged seizure, applying constitutional principles to them. Id. "The burden is on the State to prove that the search was constitutionally permissible because police did not obtain a warrant prior to searching the vehicle." Id., ¶21 (citing State v. Johnston, 184 Wis. 2d 794, 806, 518 N.W.2d 759 (1994)).

### B. Fourth Amendment Principles

¶23 The Fourth Amendment to the United States Constitution protects people against unreasonable searches and seizures. U.S. Const. amend. IV. The Wisconsin Constitution contains nearly identical protections, Wis. Const. art. I, § 11, which we have interpreted consistent with its federal counterpart. State

---

[7] "When we accept certification from the court of appeals, we acquire jurisdiction of the entire appeal." State v. Denk, 2008 WI 130, ¶29, 315 Wis. 2d 5, 758 N.W.2d 775. Accordingly, "[w]e . . . consider all issues raised before the court of appeals." Id.

v. Kramer, 2009 WI 14, ¶18, 315 Wis. 2d 414, 759 N.W.2d 598. In this case, we are focused on the meaning of "seizures" within the Fourth Amendment.

¶24 Although courts regularly talk about "searches and seizures" as though they were an inseparable tandem, they are constitutionally and analytically distinct principles. State v. Arias, 2008 WI 84, ¶25, 311 Wis. 2d 358, 752 N.W.2d 748. "A seizure differs from a search, as it 'deprives the individual of dominion over his or her person or property.'" Id. (citing Horton v. California, 496 U.S. 128, 133 (1990)).

¶25 When a seizure is claimed to have occurred, we first determine when it began and whether it was constitutionally permissible at its inception. Arias, 311 Wis. 2d 358, ¶30 (citing Terry v. Ohio, 392 U.S. 1, 19-20 (1968)). We then determine whether the officer's continued actions were "reasonably related in scope to the circumstances which justified the interference in the first place." Arias, 311 Wis. 2d 358, ¶30 (citing Terry, 392 U.S. at 20).

¶26 Not every police-citizen interaction implicates the Fourth Amendment. See Terry, 392 U.S. at 19 n.16; see also State v. Griffith, 2000 WI 72, ¶39, 263 Wis. 2d 48, 613 N.W.2d 72. Law enforcement officers may approach citizens on the street, put questions to them, and ask for identification without implicating the Fourth Amendment "as long as the police do not convey a message that compliance with their request is required." Florida v. Bostick, 501 U.S. 429, 434 (1991); see also INS v. Delgado, 466 U.S. 210, 216 (1984) ("[P]olice

12

questioning, by itself, is unlikely to result in a Fourth Amendment violation. While most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response."). Absent law enforcement conduct that indicates required compliance, these types of interactions are consensual encounters and generally do not receive Fourth Amendment scrutiny. Bostick, 501 U.S. at 434.

¶27 However, a police-citizen interaction can rise to the level of a temporary, investigative detention, commonly referred to as a Terry stop. Terry, 392 U.S. at 30. To pass Fourth Amendment scrutiny, Terry stops must be supported by reasonable suspicion. Id.; see Wis. Stat. § 968.24 (codifying the standard for Terry stops).

¶28 An officer has reasonable suspicion "when, at the time of the stop, he or she possesses specific and articulable facts which would warrant a reasonable belief that criminal activity [is or] was afoot." State v. Waldner, 206 Wis. 2d 51, 55, 556 N.W.2d 681 (1996) (citing State v. Chambers, 55 Wis. 2d 289, 294, 198 N.W.2d 377 (1972)). Finally, arrests are seizures and must be supported by probable cause. Hayes v. Florida, 470 U.S. 811, 815-16 (1985). Here, we determine whether the consensual interaction between VanBeek and Oetzel shifted at some point in time from a consensual encounter to a seizure for which reasonable suspicion was required.

¶29 A seizure occurs if, under the totality of circumstances, the "police conduct would have communicated to a

13

reasonable person that the person was not free to decline the officers' request or otherwise terminate the encounter." Bostick, 501 U.S. at 439. Stated otherwise, a seizure occurs "when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." United States v. Mendenhall, 446 U.S. 544, 552 (1980). "Determining whether a seizure has occurred is a highly fact-bound inquiry." United States v. Tyler, 512 F.3d 405, 410 (7th Cir. 2008).

¶30 We determine whether a person would have felt free to leave or otherwise terminate the encounter based on an objective view of the specific facts presented. That analysis employs the "innocent reasonable person, rather than the specific defendant." County of Grant v. Vogt, 2014 WI 76, ¶30, 356 Wis. 2d 343, 850 N.W.2d 253. "If a reasonable person would have felt free to leave but the person at issue nonetheless remained in police presence, perhaps because of a desire to be cooperative, there is no seizure." State v. Young, 2006 WI 98, ¶37, 294 Wis. 2d 1, 717 N.W.2d 729.

## C. The Certified Question

¶31 The court of appeals certified the question of whether an officer taking a citizen's driver's license back to the officer's squad car necessarily constitutes a seizure. As we explain below, we conclude that such law enforcement officer conduct could amount to a seizure. However, rather than create a bright-line rule that such conduct is always a seizure or is

14

never a seizure, we continue to analyze whether a seizure occurred based on the totality of circumstances presented.

¶32 "In the ordinary course, a police officer is free to ask a person for identification without implicating the Fourth Amendment." Hiibel v. Sixth Jud. Dist. Ct. of Nev., 542 U.S. 177, 185 (2004); see also Mendenhall, 446 U.S. at 555 ("[The agents] requested, but did not demand to see the respondent's identification and ticket. Such conduct without more, did not amount to an intrusion upon any constitutionally protected interest."). Further, an officer approaching a parked car and questioning the individual or individuals within does not necessarily amount to a seizure. See, e.g., Vogt, 356 Wis. 2d 343, ¶41 (concluding that an officer parking behind a vehicle, approaching and knocking on the window to question the occupant did not amount to a seizure); see also United States v. Jefferson, 906 F.2d 346, 349 (8th Cir. 1990) (collecting cases).

¶33 However, what may begin as a valid and consensual encounter can rise to the level of a seizure, and an officer's retention of an individual's driver's license is an important factor that courts consider. For example, in Florida v. Royer, narcotics agents approached Royer in the concourse of an airport and asked to see his ticket and his identification. Florida v. Royer, 460 U.S. 491, 494 (1983). Royer explained the discrepancy between the name on his ticket and the name on his identification. Id. The officers, rather than returning Royer's identification and airline ticket, informed Royer that they were narcotics officers and "asked Royer to accompany them

15

to a room" away from the concourse. Id. The officers also retrieved Royer's luggage without Royer's consent. Royer unlocked one suitcase, which an officer opened "without seeking further assent from Royer," and the officers broke open the other suitcase after Royer said "go ahead." Id. Each bag contained narcotics, and Royer was arrested. Id.

¶34 The Court analyzed these circumstances and the plurality concluded that "[w]hat had begun as a consensual inquiry in a public place had escalated into an investigatory procedure in a police interrogation room, where the police, unsatisfied with previous explanations, sought to confirm their suspicions." Id. at 503. The Court reasoned that because Royer was in the police interrogation room, "[t]he officers had Royer's ticket, they had his identification, and they had seized his luggage[,]" the interaction lost its consensual nature. Id. In providing additional clarity, the Court stated that, had the officers "return[ed] his ticket and driver's license, and inform[ed] him that he was free to go if he so desired, the officers may have obviated any claim that the encounter was anything but a consensual matter from start to finish." Id. at 504 (emphasis added).

¶35 A number of federal circuits have reasoned that the prolonged retention of an individual's driver's license was an important factor in determining whether a seizure occurred. For example, the Seventh Circuit included an officer's retention of

a driver's license in its non-exhaustive list of factors to consider.[8] Tyler, 512 F.3d at 410 (listing relevant factors in the totality of circumstances analysis including "whether the person was deprived of identification or other documents without which he could not leave"); see also United States v. Weaver, 282 F.3d 302, 311 (4th Cir. 2002) (noting that "the retention of a person's identification is an important factor in determining whether a 'seizure' within the meaning of the Fourth Amendment occurred" but declining to adopt a bright-line rule); Jefferson, 906 F.2d at 349 ("We have . . . noted that in certain circumstances a consensual encounter may become a seizure if the officer retains the individual's driver's license."); United States v. Chan-Jimenez, 125 F.3d 1324, 1326 (9th Cir. 1997) ("When a law enforcement official retains control of a person's identification papers, such as vehicle registration documents or a license, longer than necessary to ascertain that everything is in order, and initiates further inquiry while holding on to the

---

[8] The Seventh Circuit likened Tyler to the court's jurisprudence surrounding "airport and train station stops." United States v. Tyler, 512 F.3d 405, 410 (7th Cir. 2008). The court concluded there was a meaningful distinction in the expediency with which officers asked for, examined and ultimately returned an individual's driver's license. Id. ("Where the officers told the defendant he was under investigation for carrying drugs or retained possession of his identification, travel documents, and/or luggage, we held there was a seizure. . . . Where the officers only generally identified themselves as narcotics investigators and immediately returned the defendant's identification and travel documents, we held the initial consensual encounter did not ripen into a seizure.") (internal citations omitted).

17

needed papers, a reasonable person would not feel free to depart."); United States v. Waksal, 709 F.2d 653, 660 (11th Cir. 1983) ("We fail to see how appellant could have felt free to walk away from police officers when they still possessed the documents necessary for him to continue his journey.").

¶36 We conclude that an officer's retention of an individual's driver's license is a significant but not the dispositive fact. Our conclusion is consistent with Wisconsin Fourth Amendment precedent. In State v. Luebeck, the court of appeals analyzed an encounter during which an initially valid stop ripened into an unlawful seizure. See generally State v. Luebeck, 2006 WI App 87, 292 Wis. 2d 748, 715 N.W.2d 639. There, the officer stopped Luebeck for a lane deviation and a suspicion that he was driving under the influence. Id., ¶2. The officer obtained Luebeck's and his passenger's driver's licenses and ran warrant checks. Id. The officer also instructed Luebeck to perform a field-sobriety test, which Luebeck passed, and the officer administered a preliminary breath test; Luebeck was under the legal limit. Id., ¶3. The officer ultimately "advised Luebeck that he was going to issue him a warning for the lane deviation and then release him." Id.

¶37 While retaining Luebeck's driver's license and having not yet issued him the warning, the officer continued to question Luebeck about his passenger's ability to drive in his place. Id., ¶4. Before administering a breath test on Luebeck's passenger, the officer asked if Luebeck had anything illegal on his person or in his car. Id. Luebeck denied each

18

question and consented when the officer asked to search him and the car.  Id.  Luebeck had nothing on his person, but the car search uncovered marijuana.  Id., ¶5.  Luebeck argued that he was unlawfully seized at the time he gave his consent to search. Id., ¶6.

¶38  The circuit court and court of appeals agreed with Luebeck.  At the outset, the court of appeals agreed with the State that the initial traffic stop was valid.  Id., ¶¶7, 10. However, after examining the totality of circumstances, the court of appeals concluded that a reasonable person in Luebeck's position would not have felt free to leave or otherwise terminate the encounter at the time that Luebeck consented to the search.  Id., ¶15.  The court distinguished Luebeck's case from two cases on which the State relied and explained:

> Luebeck was detained for over twenty minutes, his driver's license was held by the police, no citation or warning for lane deviation had yet been issued, he passed all of the field sobriety tests and his preliminary breath test indicated a blood alcohol content below the legal limit, and yet he was being questioned about his passenger's ability to drive in his place.  In Williams, the officer issued and explained the traffic warning, returned Williams' identification, shook hands with Williams, and said, "[W]e'll let you get on your way then." . . . In Gaulrapp, we expressly distinguished the case from others that "involved prolonged detention after the officers concluded or should have concluded that the justification for the initial stop did not warrant further detention."

Id. (quoting State v. Williams, 2002 WI 94, ¶¶7-12, 255 Wis. 2d 1, 646 N.W.2d 834 and State v. Gaulrapp, 207 Wis. 2d 600, 608, 558 N.W.2d 696 (Ct. App. 1996)).

19

¶39 In coming to its conclusion, the court examined numerous Tenth Circuit cases that had concluded "that a motorist's consent to search his or her vehicle is invalid where a deputy does not return documents relating to the initial traffic stop prior to asking for consent to search the vehicle." Luebeck, 292 Wis. 2d 748, ¶16.[9]  The court of appeals did not adopt a bright-line rule to that effect; rather, it concluded that "the fact that [a] person's driver's license or other official documents are retained by the officer is a key factor in assessing whether the person is 'seized.'"  Id.

¶40 We made a similar statement in Floyd; however, Floyd's language must be interpreted in context.  There, Floyd was stopped because his car registration had been suspended for emissions violations.  Floyd, 377 Wis. 2d 394, ¶2.  Floyd had no driver's license with him, but he did identify himself with a Wisconsin State identification card, which he handed to the officer.  Id., ¶4.  After the officer had drafted the relevant citations, he returned to Floyd's car and while retaining Floyd's identification card, he asked Floyd to step out of the car so that he could explain the citations to him.  Id., ¶5.  It was at this point that Floyd alleged that his seizure was unlawfully extended.  Id., ¶14.

---

[9] See United States v. Lee, 73 F.3d 1034, 1040 (10th Cir. 1996), overruled on other grounds by United States v. Holt, 264 F.3d 1215, 1226 n.6 (10th Cir. 2001); United States v. Lambert, 46 F.3d 1064, 1068 (10th Cir. 1995); United States v. Walker, 933 F.2d 812, 817 (10th Cir. 1991).

¶41 After Floyd had exited the vehicle, the officer asked if he could search him, to which request the circuit court found Floyd consented. Id., ¶9. Floyd argued on appeal that his "consent" was not voluntary. "Specifically, he argued that because Deputy Ruffalo had not returned his identification card prior to asking whether he would consent to a search, his response could not be voluntary because he was unlawfully seized." Id., ¶31. This argument conflated Floyd's earlier argument that his seizure became unlawful because it was extended with an implication that consent was not voluntarily given because the officer had not returned his identification card. Id., ¶32. Although we reasoned that if an officer retains a person's identification "there is good reason to believe the person was not 'free to leave' at that time," id., ¶31, we concluded that it had no bearing on Floyd's seizure because his initial seizure was lawful and that seizure was not unlawfully extended during the explanation of the tickets or the officer's subsequent request to search him. Id., ¶31.

¶42 It was statements from Luebeck and Floyd that may have caused the court of appeals to certify a question to us. We stand by statements made in the contexts presented in those cases. While the withholding or retention of an individual's driver's license may be a "key factor," important, or analytically significant, we decline to set forth a bright-line rule that any time an officer retains an individual's driver's license that person is seized. Rather, courts should continue

21

to analyze whether the individual is seized based upon the totality of circumstances.

¶43 The above cases teach that police conduct is the dispositive factor in determining whether a seizure has occurred. As the Supreme Court clearly set out in Bostick, "the crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" Bostick, 501 U.S. at 437 (quoting Michigan v. Chesternut, 486 U.S. 567, 569 (1988)).

¶44 Applying the above principles to this case, based upon the totality of the circumstances, Oetzel taking VanBeek's license back to his squad car did not amount to a seizure. Oetzel took VanBeek's and Sitzberger's licenses back to the squad car upon his request to do so and with their permissions. The video-cam Oetzel was wearing recorded that when Oetzel received the licenses that they handed to him, he began to move away from VanBeek's car. He said, "Okay. I'll be right back, okay?" VanBeek and Sitzberger both replied "alright." This appears to be a continuation of what had been a cordial interaction among VanBeek, Sitzberger and Oetzel.

¶45 A reasonable person in VanBeek's position would have understood that their "alright" responses permitted Oetzel to retain her driver's license and that her ability to lawfully operate her vehicle would be delayed until Oetzel returned to her car. Further, Oetzel reasonably relied on their verbal

22

interactions before he returned to his squad car. Accordingly, under the totality of circumstances that bear on the certified question, VanBeek consented to Oetzel's retention of her license until he returned from his squad car, and therefore, she was not seized when he took her driver's license to the squad car and ran a warrant check.[10]

### D. Other Issues Presented

#### 1. Seizure

¶46 Having re-affirmed that the totality of circumstances continues to be the correct analytical metric by which to analyze claimed seizures, we determine based on that metric whether VanBeek was seized at any subsequent point during her interaction with Oetzel. We conclude that VanBeek was seized when Oetzel returned to her vehicle, retained her driver's license, and continued to pose questions to her and Sitzberger in order to prevent them from leaving before the K9 unit arrived. We conclude that a reasonable person in VanBeek's position would not have felt free to drive away and terminate the encounter with Oetzel while he retained her driver's license and continued to question her and Sitzberger.

---

[10] Although we determine that in this case there was not a seizure when Oetzel took their identifications back to his squad car, nothing in this opinion should be taken as concluding that an officer running a records check back at the officer's squad car will never amount to a seizure. Courts are to continue to analyze the totality of circumstances of each encounter.

23

¶47 We also conclude that there are no facts from which to conclude that VanBeek consented to Oetzel's retention of her driver's license after he returned to her vehicle. Rather, a reasonable person in VanBeek's position would have believed that Oetzel would return her driver's license as soon as he returned from his squad car so "he could get out of here."

¶48 However, when Oetzel returned, rather than "just getting out of here" as he originally said, he retained their driver's licenses. He also continued to question them for nearly eight more minutes, in order to hold them until the K9 unit he had requested arrived. Merely because this was not a traffic stop in the ordinary sense, it does not follow that Oetzel's conduct did not turn the interaction into an investigative detention.

¶49 Oetzel's questioning after his return from his squad car was repetitive of questions he had already asked and they had answered. VanBeek was confused by Oetzel's repetitive questions and asked him if her "license was bad," indicating that she had expected to have her license returned and be on her way back to Cascade.

¶50 A reasonable person being repetitively questioned while the officer retained her driver's license would not feel free to drive away and thereby terminate the encounter. It was Oetzel's conduct of retaining their driver's licenses while repeatedly asking questions that she and Sitzberger had already answered, that coerced VanBeek to remain in Sheboygan. Also, Oetzel's questioning was intended to require them to remain in

24

Sheboygan so that time would pass and the K9 unit would appear to sniff for drugs. Accordingly, VanBeek was seized during the second round of repetitive questions while Oetzel retained her driver's license.[11]

### 2. Reasonable Suspicion

¶51 A seizure runs afoul of the Fourth Amendment if it is unreasonable, and a temporary detention is unreasonable if under the totality of circumstances it is not supported by reasonable suspicion. Coffee, 391 Wis. 2d 831, ¶2. As we have concluded that Oetzel seized VanBeek during their second interaction, we now determine whether the seizure was supported by reasonable suspicion. We conclude that it was not.

¶52 Reasonable suspicion, as with other Fourth Amendment inquiries, is an objective test that examines the totality of circumstances. State v. Guzy, 139 Wis. 2d 663, 675, 407 N.W.2d 548 (1987). An officer has reasonable suspicion if he or she has "a suspicion grounded in specific, articulable facts and reasonable inferences from those facts, that the individual has

---

[11] The circuit court concluded, and the State argued, that this interaction was justified by the community caretaker doctrine. We disagree. An officer exercises a bona fide community caretaker function generally "when the officer discovers a member of the public who is in need of assistance." State v. Kramer, 2009 WI 14, ¶32, 315 Wis. 2d 414, 759 N.W.2d 598. As we discussed above, we conclude that Oetzel's interaction with VanBeek was not to determine whether she or Sitzberger were in need of assistance but was rather to investigate the anonymous call that the police department received. Accordingly, Oetzel was not performing a bona fide community caretaker function and the doctrine does not apply here.

25

committed a crime." Id. "An inchoate and unparticularized suspicion or 'hunch' will not suffice." Id. (citing Terry, 392 U.S. at 27).

¶53 The State offered the following five facts that it contends support the conclusion that Oetzel had reasonable suspicion that VanBeek and Sitzberger had been, or were about to be, involved in criminal conduct: (1) "VanBeek and Sitzberger were hanging around a neighborhood for at least several minutes"; (2) "Oetzel did not receive a satisfactory explanation for that behavior"; (3) "the suspicious behavior here occurred late at night: Officer Oetzel began speaking to VanBeek and Sitzberger around 12:22 a.m."; (4) "an anonymous caller had reported that two people were sitting in a truck for an hour. . . . Based on his training and experience, Officer Oetzel thought that people 'are usually utilizing narcotics' if they are sitting in a parked vehicle for a long period of time"; and (5) "someone here made brief contact with a vehicle. The concerned caller told police that someone with a backpack had come to the truck and then left." To be sure, because we have concluded that the seizure occurred during the second interaction, we note that Oetzel also knew that VanBeek had overdosed earlier in the year and that Sitzberger was on some sort of supervision.

¶54 In response, VanBeek argues that there is nothing suspicious about sitting in a car and that the facts derived from the anonymous call, namely that the car had been in the location for an hour and that someone approached the vehicle

26

with a backpack and then left without it, were insufficient to support reasonable suspicion of criminal conduct.

¶55 We begin with the anonymous call. "[A]n anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity . . . ." Alabama v. White, 496 U.S. 325, 329 (1990) (citing Illinois v. Gates, 462 U.S. 213, 237 (1983)). "[A]n informant's 'veracity,' 'reliability,' and 'basis of knowledge,'" are "highly relevant" to testing the strength of anonymous information within the totality of circumstances. State v. Richardson, 156 Wis. 2d 128, 140, 456 N.W.2d 830 (1990) (cleaned up). In Richardson, we concluded that "the corroboration by police of innocent details of an anonymous tip may under the totality of the circumstances give rise to reasonable suspicion to make a stop." Id. at 142. We articulated two guiding principles for assessing the weight that we should place on anonymous calls:

> First, the greater the amount, specificity and uniqueness of the detail contained in an anonymous tip, the more likely it is that the informant has an adequate basis of knowledge. When attempting to define the nature of the verified details of the tip necessary, the White Court placed special emphasis on the police verification of the caller's predictions of the third party/suspect's future actions. White, [496 U.S. at 332]. The Court referred to this as a verification of significant aspects of the tip. We adopt this aspect of verification of the anonymous tip which serves to avoid investigative stops based on minimal facts that any passerby or resident on the street could enunciate. Second, when significant aspects of an anonymous tip are independently corroborated by the police, the inference arises that the anonymous informant is telling the truth about the allegations of criminal activity. Under this

27

principle, police who have corroborated significant aspects of a tip are allowed the reasonable inference under the circumstances that if an informant is correct as to these significant aspects, he or she is more probably than not correct as to the ultimate fact of criminal activity.

Id. at 142-43 (footnote omitted).

¶56 We continue to abide by these principles, but we conclude that the dearth of significant facts enunciated by the anonymous caller in this case substantially lowers the weight that we place on the call in the totality of circumstances. Unlike Richardson, White or Gates,[12] wherein the respective tipsters were able to provide unique, useful and predictive information to police prior to police interaction, the caller here merely told Sheboygan police that a non-descript truck, occupied by two people, was parked on the street for "an hour" and that someone had approached the vehicle with a backpack and then left without it. Those facts are "minimal facts that any passerby or resident on the street could enunciate." See id. at 142. The caller did not allege that the persons in the truck were engaged in criminal activity. Accordingly, as we consider

_____

[12] See State v. Richardson, 156 Wis. 2d 128, 132, 456 N.W.2d 830 (1990) (the tip provided "a detailed description of the defendant and his immediate future plans"); Alabama v. White, 496 U.S. 325, 327 (1990) (the call "stat[ed] that Vanessa White would be leaving 235-C Lynwood Terrace Apartments at a particular time in a brown Plymouth station wagon with the right taillight lens broken, that she would be going to Dobey's Motel, and that she would be in possession of about an ounce of cocaine inside a brown attaché case"); Illinois v. Gates, 462 U.S. 213, 225 (1983) (the tip was a letter that described how the Gates sold drugs including the specific process the two used to travel between Florida and Illinois).

a call about a non-descript truck parked on the street with two occupants, the additional assertion that someone came to the truck with a backpack and left without it does not weigh heavily in our analysis. Apparently, those facts were not significant to Oetzel because he never asked VanBeek or Sitzberger about a third person or a backpack.

¶57 The call in this case is more analogous to that in Florida v. J.L., 529 U.S. 266 (2000). There, a person anonymously called the police to inform them "that a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun." Id. at 268. Officers responded, saw three men "just hanging out" and one of the individuals at the bus stop matched the caller's description. Id. "Apart from the tip, the officers had no reason to suspect any of the three of illegal conduct." The officers frisked J.L. and uncovered a firearm.[13] Id.

¶58 The Court concluded that "[t]he tip . . . lacked the moderate indicia of reliability present in White and essential to the Court's decision in that case." Id. at 271. Further, the Court noted "[t]hat the allegation about the gun turned out to be correct does not suggest that the officers, prior to the frisks, had a reasonable basis for suspecting J.L. of engaging in unlawful conduct." Id. The Court rejected the petitioner's

---

[13] At the time of his arrest, J.L. was 16 years of age, and "was charged . . . with carrying a concealed firearm without a license and possessing a firearm while under the age of 18." Florida v. J.L., 529 U.S. 266, 269 (2000).

29

argument "that the tip was reliable because its description of the suspect's visible attributes proved accurate." Id. at 271. In rejecting Florida's argument, the Supreme Court held that "a tip [has to] be reliable in its assertion of illegality, not just in its tendency to identify a determinate person." Id. at 272.

¶59 Here, and similar to J.L., Oetzel was able to corroborate only the identifying factors given by the caller, e.g., that there was a truck parked at the alleged location that had two occupants. The only fact that could have been somewhat suspicious was that the caller said someone approached the vehicle with a backpack and then left without it. However, Oetzel asked no questions about a third person or a backpack, and the record does not reflect whether such a person existed. We agree with the parties that the call, alone, could not have supported reasonable suspicion. We conclude that the call was useful only to the extent that it may have "help[ed] the police correctly identify the person whom the tipster mean[t] to accuse." See id. at 272.

¶60 Aside from the call, all that Oetzel knew at the time of the seizure was that VanBeek overdosed earlier in the year and that Sitzberger was on supervision. Oetzel did not know the source of drugs that caused VanBeek's overdose, whether from a physician or from an illegal source. There is nothing in the record to connect her overdose in February with criminal activity in November.

30

¶61 That Sitzberger was on supervision also provides no reason to believe that he was involved in criminal activity with VanBeek.  As the Tenth Circuit explained in United States v. Sandoval, 29 F.3d 537, 542 (10th Cir. 1994), a prior conviction for an unknown offense provides no support for reasonable suspicion.  Id.  If this were not the case, those on supervision subsequent to a conviction could be searched anywhere and anytime that the fact of supervision became known.

¶62 Furthermore, Oetzel testified that he neither saw nor smelled any indication of drug use, and VanBeek's window was rolled down as she spoke with him.  Accordingly, we are not convinced that at the time of the seizure the State met its burden of proving that Oetzel had reasonable suspicion that criminal activity was afoot.

¶63 Two cases from the court of appeals are supportive of our conclusion.  In State v. Betow, 226 Wis. 2d 90, 95-98, 593 N.W.2d 499 (Ct. App. 1999), where Betow was stopped for speeding, the court of appeals concluded that the officer prolonged an initially valid traffic stop without reasonable suspicion that Betow had controlled substances in his possession.  The State argued that reasonable suspicion existed based on the following facts:  (1) Betow's wallet had a mushroom sticker on it, which the State argued denoted drug use; (2) the stop occurred late at night; (3) Betow seemed nervous; (4) Betow was returning to Appleton from Madison, a city that the State argued was associated with ready drug obtainment; and (5) Betow did not provide the officer with a plausible explanation for his

31

purpose in Madison. Id. The court of appeals examined these facts as the totality of circumstances relative to Betow's seizure and concluded that the officer did not have reasonable suspicion to prolong the stop.[14] Id. at 98.

¶64 In State v. Gammons, 2001 WI App 36, 241 Wis. 2d 296, 625 N.W.2d 623, Gammons was a passenger in a car stopped because it did not have a rear license plate. Id., ¶2. After questioning extended beyond the license plate, Gammons was arrested for possession with intent to deliver cocaine. Id., ¶1. He asserted that the officer's questions exceeded the permissible scope of the stop. Id. The court of appeals analyzed the following facts: (1) "an out-of-town vehicle in an area purportedly known for drug activity"; (2) "a night-time stop"; (3) "and a nervous suspect." Id., ¶23. The court of appeals held that these facts, taken together, did not form a sufficient basis for reasonable suspicion. Id., ¶25. The court held that because the officer did not have reasonable suspicion of drug activity, "the Fourth Amendment required [the officer] to terminate the stop and allow Gammons and the other men to continue about their business." Id., ¶24. As we set forth

_____

[14] Although Betow and Gammons each dealt with the extension of a traditional traffic stop, an officer may not extend a lawful traffic stop "absent the reasonable suspicion ordinarily demanded to justify detaining an individual." Rodriguez v. United States, 575 U.S. 348, 355 (2015). Because the reasonable suspicion analysis is the same for extensions of stops as it is for initial stops, see State v. Betow, 226 Wis. 2d 90, 95, 593 N.W.2d 499 (Ct. App. 1999), we apply the principles articulated in those cases to the reasonable suspicion assessment here.

32

above, the State's proffered foundation for reasonable suspicion here is considerably weaker than those in Betow and Gammons.

¶65 Accordingly, based on the totality of circumstances, Oetzel did not have reasonable suspicion when he returned to VanBeek's truck, retained her driver's license and continued to question her; therefore her seizure was unlawful.

### III. CONCLUSION

¶66 On the certified question of whether a driver is seized when a police officer takes the driver's identification to the officer's squad car to run a records check, we conclude that the answer depends on the totality of circumstances surrounding the encounter. Further, while VanBeek was not seized when Officer Oetzel took her driver's license to run a records check, VanBeek was seized when Oetzel returned to her vehicle, withheld her driver's license and continued to question her and her passenger in order to hold her until a drug-sniff dog, i.e., the K9 unit, that he had requested arrived. Finally, we conclude that, based on the totality of circumstances, Oetzel did not have reasonable suspicion that VanBeek was engaged in criminal activity at the time he seized her. Accordingly, we reverse the circuit court's judgment of conviction and remand with instruction to grant VanBeek's motion to suppress.

*By the Court.*—Reversed and remanded with instructions.

¶67 REBECCA FRANK DALLET, J. (*concurring*). I concur that Heather VanBeek was unlawfully seized when police retained her driver's license while repetitively questioning her.[1] I disagree, however, with the conclusion that VanBeek was not seized earlier in her encounter with police. The totality of the circumstances reveals that VanBeek was seized when police took her driver's license back to the squad car for a records check because, at that point, a reasonable person would not feel free to leave or to otherwise end the interaction.

I

¶68 Sheboygan Police Officer Sung Oetzel responded to an anonymous call reporting that two people had been sitting in a parked truck in the same spot for approximately an hour and that a person wearing a backpack had approached the truck. Oetzel approached the truck with his squad car's spotlight activated and asked VanBeek, who was sitting in the driver's seat, why and how long she had been parked there. VanBeek explained that she had been there about ten minutes waiting for her passenger and that they were about to drive home to Cascade.

¶69 Oetzel responded that the explanation "sound[ed] legit," but still asked VanBeek and her passenger for identification "for [his] report." The passenger asked if he could just write down his information, but Oetzel stated that he needed a photo ID to "compare faces." Both VanBeek and her passenger provided their driver's licenses. With both licenses

---

[1] I join the majority/lead opinion with respect to ¶¶22-35 and ¶¶46-65.

1

in hand, Oetzel stated "I'll be right back, okay," and as he walked away, VanBeek's passenger responded, "alright." VanBeek's response to Oetzel was unclear. Before Oetzel reached his squad car, he explained to another officer that he had not observed "anything suspicious."

¶70 Oetzel checked VanBeek's record from his squad car and learned that she had overdosed several months earlier. Oetzel then ordered a drug-sniffing dog to the scene. He returned to VanBeek's truck, retaining her license while repetitively questioning her and her passenger until the dog arrived. Once on scene, the dog alerted officers to the evidence underlying VanBeek's conviction and this appeal.

¶71 We review the court of appeals' certified question of "whether a consensual encounter becomes an unconstitutional seizure under the Fourth Amendment when an officer requests and takes an individual's drivers license to the officer's squad car without reasonable suspicion." While I agree that such conduct is not a seizure in all circumstances, I conclude that under the circumstances here, it was.

II

¶72 Interactions between citizens and the police fall on a spectrum. On one end are interactions outside the Fourth Amendment, such as voluntary encounters in public spaces, which may include the police requesting someone's identification. See Florida v. Bostick, 501 U.S. 429, 437 (1991). Further down the spectrum and subject to the Fourth Amendment are Terry and traffic stops—short investigative seizures permissible only if

2

the police have reasonable suspicion that a person has just committed, is committing, or is about to commit a crime or traffic violation. Terry v. Ohio, 392 U.S. 1 (1968) (Terry stops); State v. Floyd, 2017 WI 78, ¶20, 377 Wis. 2d 394, 898 N.W.2d 560 (traffic stops). At the opposite end of the spectrum from voluntary encounters is a seizure[2]: police conduct that "deprives the individual of dominion over his or her person." E.g., Horton v. California, 496 U.S. 128, 133 (1990). Police conduct constitutes a seizure when, considering all of the circumstances, it would cause a reasonable person to believe that she is not "free to leave."[3] I.N.S. v. Delgado, 466 U.S. 210, 215 (1984).

¶73 Interactions on the spectrum are dynamic such that police conduct can transform an initially voluntary encounter

---

[2] The other Fourth Amendment event, a "search," is not alleged or implicated during this first interaction and is therefore not discussed in this opinion.

[3] Courts sometimes state this question differently depending on the case's particular facts. State v. Williams, 2002 WI 94, ¶22 n.6, 255 Wis. 2d 1, 646 N.W.2d 834. Regardless of how the test is phrased, the "key question" is the same: "whether a reasonable person can 'terminate the encounter' with police." Peery v. City of Miami, 977 F.3d 1061, 1071 (11th Cir. 2020) (quoting Florida v. Bostick, 501 U.S. 429, 439 (1991)); see also, e.g., Bostick, 501 U.S. at 435-36 (asking whether a reasonable person would feel "free to decline the officers' requests or otherwise terminate the [police] encounter" because the defendant, a passenger on an interstate bus, was already not free to leave for reasons outside the police's presence); Michigan v. Chesternut, 486 U.S. 567, 576 (1988) (asking whether a police car accelerating to drive alongside a defendant was so intimidating that a reasonable person would not feel "free to disregard the police presence and go about his business").

into a seizure. See United States v. Monsivais, 848 F.3d 353, 358 (5th Cir. 2017) (officer converted a non-Fourth Amendment roadside assistance or "welfare check" into a Fourth Amendment seizure by announcing he would pat down the stranded driver). If an individual is seized without sufficient Fourth Amendment justification, then subsequently obtained evidence must generally be suppressed. See State v. Scull, 2015 WI 22, ¶¶20-21, 361 Wis. 2d 288, 862 N.W.2d 562.

¶74 Because Oetzel lacked reasonable suspicion that VanBeek had committed or was about to commit a crime or traffic violation, any seizure of VanBeek, even a temporary one, would be unlawful.[4] Oetzel's encounter with VanBeek started out as voluntary, requiring no special justification to initially approach and question VanBeek in her truck since she was parked on a public street. See, e.g., United States v. Kim, 25 F.3d 1426, 1430 n.1 (9th Cir. 1994); 4 Wayne R. LaFave, Search & Seizure § 9.4(a) (6th ed. 2020). Thus the question is whether Oetzel's subsequent actions toward VanBeek escalated this initially voluntary interaction to the level of a seizure.

¶75 The interaction moved toward a seizure when Oetzel asked VanBeek for her photo ID. Generally, such a request is

---

[4] There is no support in the record for the community caretaker exception. Oetzel observed neither VanBeek nor her passenger in distress and thus lacked "reasonable grounds to believe there [was] an emergency at hand and an immediate need for [his] assistance for the protection of life or property." See State v. Ferguson, 2001 WI App 102, ¶17, 244 Wis. 2d 17, 629 N.W.2d 788 (quoting United States v. Cervantes, 219 F.3d 882, 888 (9th Cir. 2000)).

not a Fourth Amendment seizure. See Delgado, 466 U.S. at 216. But Oetzel's conduct indicated that his request was in fact a command that VanBeek could not refuse. See Bostick, 501 U.S. at 437 (explaining that a seizure occurs when police "ask to examine the individual's identification" in a way that indicates "compliance with their requests is required"). Specifically, Oetzel rejected the offer to write down the requested information, stating instead that he needed a photo ID to "compare faces." When an officer rejects a less-intrusive alternative, a reasonable person could believe that her only other option is to comply with the officer's "request." Cf. id.

¶76 Even so, until Oetzel walked away, VanBeek at least had an opportunity to ask for her license back so she could terminate the encounter and go on her way (although whether anyone would actually feel comfortable doing this is another question[5]). Once Oetzel left the side of VanBeek's car, however, that opportunity vanished. No reasonable person would think she could drive away when an officer walks off with her driver's license, particularly when doing so would violate state law. See Wis. Stat. § 343.18(1) (2020-21) (prohibiting the operation of a vehicle without immediately possessing one's license); Floyd, 377 Wis. 2d 394, ¶31 ("If an officer withholds a person's

---

[5] For that reason, several courts have held that persons are seized when an officer questions them while retaining their license. See United States v. Lopez, 443 F.3d 1280, 1285-86 (10th Cir. 2006); United States v. Chavez-Villarreal, 3 F.3d 124, 128 (5th Cir. 1993); United States v. Jordan, 958 F.2d 1085, 1087-89 (D.C. Cir. 1992).

documents, there is good reason to believe the person was not 'free to leave' at that time."); see also United States v. Thompson, 712 F.2d 1356, 1359 (11th Cir. 1983) (concluding that an officer "effectively immobilized" and therefore seized a driver by retaining the driver's license because driving away without the license would violate state law). Thus, VanBeek was unlawfully seized because Oetzel's conduct would cause a reasonable person in VanBeek's circumstances to feel as though she were not free to leave or to otherwise terminate the encounter. See Delaware v. Prouse, 440 U.S. 648, 653-55, 657 (1979) (holding that, absent reasonable suspicion, "detaining the driver in order to check his driver's license" is a Fourth Amendment violation).

¶77 VanBeek's alleged "consent" to Oetzel confiscating her license does not change that conclusion for two reasons. First, it confuses the role consent plays in a Fourth Amendment analysis. A person's consent informs the reasonableness of a seizure, not whether an officer's conduct constitutes a seizure in the first place. See United States v. Jordan, 958 F.2d 1085, 1088 (D.C. Cir. 1992) (explaining that whether a seizure occurred depends only on what the "police conduct reasonably communicated"). I have uncovered no case supporting the novel proposition that one can consent to a seizure of her person. Second, even if one could so consent, the record contains no support for the conclusion that VanBeek unequivocally consented to Oetzel's taking her license back to his squad car for the purpose of running a records check. See State v. Reed, 2018

6

WI 109, ¶¶8, 57, 384 Wis. 2d 469, 920 N.W.2d 56 (holding that, in the context of a Fourth Amendment search, consent "must be unequivocal and specific").

¶78 Instead, the record is, at best, ambiguous as to whether VanBeek agreed to Oetzel's taking her license back to his squad car. Oetzel did not testify on that point and the circuit court made no factual findings regarding what VanBeek said to Oetzel or whether she consented to Oetzel taking her license back to his car. That leaves Oetzel's body-camera footage. The video strongly suggests that when Oetzel took VanBeek's license and told her that he would "be right back," he was telling VanBeek what he was going to do, not asking for her permission to do it. Oetzel neither informed VanBeek of the specific reason why he was taking her license nor awaited her response before walking away. Moreover, VanBeek's response is unclear. Although VanBeek's passenger responded to Oetzel's statement by saying "alright," VanBeek's response is muddled and lost under her passenger's voice. While one might infer that she did not say "no," such an inference falls short of the unequivocal, affirmative statement the law requires. See United States v. Carter, 378 F.3d 584, 588 (6th Cir. 2004) ("Even a spoken assent to search may be too ambiguous to establish consent in certain circumstances."); cf. Reed, 384 Wis. 2d 469, ¶57 (explaining that "mere acquiescence" is

insufficient to constitute consent (quoted source omitted)).[6] The record evidence therefore belies any consent justification (if one were even possible) for her being seized.

¶79 VanBeek was thus seized when Oetzel took her license back to his squad car. That seizure continued when Oetzel returned to VanBeek's truck yet retained her license and repetitively questioned her until a drug-sniffing dog arrived. Accordingly, any evidence obtained as a result of Oetzel's unlawful seizure of VanBeek must be suppressed. For these reasons, I concur.

¶80 I am authorized to state that Justices ANN WALSH BRADLEY and JILL J. KAROFSKY join this concurrence.

---

[6] Even assuming the passenger's "alright" constitutes consent regarding his license, he has neither actual nor apparent "common authority" to consent on VanBeek's behalf. Cf. State v. Wantland, 2014 WI 58, ¶23, 355 Wis. 2d 135, 848 N.W.2d 810; see also United States v. Woodrum, 208 F.3d 8, 12 (1st Cir. 2000) (order denying rehearing en banc) (Lynch, J., dissenting) ("[S]imply, and obviously, a person cannot give third-party consent to the . . . seizure of another person.").

¶81 ANNETTE KINGSLAND ZIEGLER, C.J. *(dissenting).* While I agree with the majority/lead opinion's[1] conclusion that VanBeek was not seized when Officer Oetzel took her driver's license to his squad car and ran a warrant check, see majority/lead op., ¶45, I write separately because VanBeek was not seized when Officer Oetzel returned to VanBeek's vehicle and continued asking her follow-up questions. When looking at the totality of the circumstances, it is clear that VanBeek was free to ask for her driver's license back and end the interaction. Consequently, her encounter with Officer Oetzel was consensual, and she was not seized. Accordingly, I respectfully dissent.

## I. ANALYSIS

¶82 For purposes of the Fourth Amendment, there are two types of seizures. The first type is a "physical force" seizure. See United States v. Mendenhall, 446 U.S. 544, 552 (1980). The second type is a "show of authority" seizure. Id. Under either type of seizure, a seizure occurs "[o]nly when the officer . . . has in some way restrained the liberty of a citizen." Id.

---

[1] Justice Roggensack's opinion was joined in part by Justices Ann Walsh Bradley, Dallet, and Karofsky. Specifically, those justices joined Justice Roggensack's opinion "with respect to ¶¶22-35 and ¶¶46-65." Concurrence, ¶67 n.1. Thus, for the sake of clarity, I refer to Justice Roggensack's opinion as the "majority/lead" opinion throughout this dissent because the opinion in its entirety is not joined by a majority of the court. The opinion is a "majority" with respect to ¶¶22-35 and ¶¶46-65. All other paragraphs represent the rationale of Justice Roggensack and thus constitute a lead opinion.

1

¶83 While an officer cannot unreasonably seize a person, this does not mean that police are prohibited from interacting with members of the public. Police and members of the public regularly engage in "consensual encounters," which do not implicate the Fourth Amendment. See Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968); see also State v. Griffiths, 2000 WI 72, ¶39, 236 Wis. 2d 48, 613 N.W.2d 72. As the United States Supreme Court has explained, an encounter between police and an individual "will not trigger Fourth Amendment scrutiny unless it loses its consensual nature." Florida v. Bostick, 501 U.S. 429, 434 (1991). Under this framework, we have held that certain encounters between police and individuals are consensual, including the police approaching individuals, asking them questions, requesting their identification, and asking for consent to search. Griffiths, 236 Wis. 2d 48, ¶39 (citing Bostick, 501 U.S. at 434-35). These interactions are permissible under the Fourth Amendment "as long as the police do not convey a message that compliance with their requests is required." Bostick, 501 U.S. at 434-35.

¶84 Although "consensual encounters" are not subject to Fourth Amendment scrutiny, an officer cannot temporarily detain a person for investigative purposes without implicating the Fourth Amendment because such a detention is a seizure. Terry, 392 U.S. at 30. Such temporary, investigative detentions are referred to as Terry stops. See, e.g., State v. Blatterman, 2015 WI 46, ¶24, 362 Wis. 2d 138, 864 N.W.2d 26. For a Terry stop to pass Fourth Amendment scrutiny, the officer must have

2

"reasonable suspicion that a crime has been committed, is being committed, or is about to be committed." State v. Young, 2006 WI 98, ¶20, 294 Wis. 2d 1, 717 N.W.2d 729; see also Wis. Stat. § 968.24.

¶85 To determine whether an encounter between police officers and an individual was either a consensual encounter or a seizure, we "must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." Bostick, 501 U.S. at 439. Phrased differently, we must determine, under the totality of the circumstances, whether "a reasonable person would feel free 'to disregard the police and go about his business.'" Id. at 434 (quoting California v. Hodari D., 499 U.S. 621, 628 (1991)).[2] "The test is objective and considers whether an innocent reasonable person, rather than the specific defendant" would have felt free to terminate the encounter and go about their business. County of Grant v. Vogt, 2014 WI 76, ¶30, 356 Wis. 2d 343, 850 N.W.2d 253. Even if an innocent reasonable person would have felt free to terminate the encounter and go about their business, "but the person at issue nonetheless remain[s] in police presence, perhaps because of a

---

[2] As part of the totality of the circumstances, as explained in the majority/lead opinion's answer to the certified question in this case, "an officer's retention of an individual's driver's license is a significant but not the dispositive fact." Majority/lead op., ¶36.

desire to be cooperative, there is no seizure." Young, 294 Wis. 2d 1, ¶37.

¶86 Applying this test to the facts of VanBeek's case, as capably set forth in the majority/lead opinion, it is clear that VanBeek was not seized when Officer Oetzel either went back to his squad car or when Officer Oetzel returned to VanBeek's vehicle and retained her identification.[3]

¶87 I agree with the majority/lead opinion's statement "that [Officer] Oetzel taking VanBeek's license back to his squad car did not amount to a seizure." Majority/lead op., ¶44. Such a conclusion is consistent with the longstanding Fourth Amendment principles that I just explained. The concurrence suggests that there is "no case supporting the novel proposition that one can consent to a seizure of her person." Concurrence, ¶77. However, an individual affirmatively approving an officer's retention of a driver's license indicates that the encounter has not lost its consensual nature. Bostick, 501 U.S. at 434. Such affirmative approval——commonly referred to as consent——is a strong indicator under the totality of the circumstances that the encounter has retained its consensual nature. See Mendenhall, 445 U.S. at 558. Thus, as the majority/lead opinion aptly described, "A reasonable person in

---

[3] VanBeek concedes that her encounter with Officer Oetzel was consensual when Officer Oetzel first approached her vehicle and when she handed Officer Oetzel her license. The dispute arises only with regard to whether the encounter remained consensual after Officer Oetzel returned to his squad car with VanBeek's identification.

VanBeek's position would have understood that [VanBeek's and her passenger's] 'alright' responses permitted [Officer] Oetzel to retain her driver's license." Majority/lead op., ¶45.

¶88 Moreover, even without her license, VanBeek could still "disregard the police and go about [her] business." As she explained to Officer Oetzel when he first approached, she and her passenger were sitting in the vehicle for some period of time. As such, VanBeek's "business"——that she must have felt free to return to——was sitting in her vehicle with her passenger. Officer Oetzel returning to his squad car with VanBeek's driver's license in no way impeded upon VanBeek's business of sitting in her vehicle. Furthermore, VanBeek never signaled that she wanted to leave, which would indicate that her business was leaving the area. Her affirmative approval to Officer Oetzel returning to his squad car with her identification strongly suggests that her business was sitting in her vehicle, not leaving the area. Accordingly, VanBeek was not seized when Officer Oetzel returned to his squad car with VanBeek's driver's license.[4]

---

[4] The concurrence wrongly concludes to the contrary, believing that Officer Oetzel walking away with VanBeek's driver's license automatically transformed the consensual encounter into a seizure. Concurrence, ¶76. Such a conclusion effectively asks for a bright-line rule that whenever an officer walks away with an individual's driver's license, the individual is automatically seized. As is routinely stated, "[t]he Supreme Court has eschewed bright-line rules [in Fourth Amendment inquiries], instead emphasizing the fact-specific nature of the reasonableness inquiry." State v. Malone, 2004 WI 108, ¶17, 274 Wis. 2d 540, 683 N.W.2d 1 (quoting Ohio v. Robinette, 519 U.S. 33, 39 (1996)); see generally State v. Coffee, 2020 WI 53, ¶¶37-42, 391 Wis. 2d 831, 943 N.W.2d 845 (explaining why bright-

(continued)

5

¶89 Having concluded that VanBeek was not seized when Officer Oetzel returned to his squad car, I now address the point at which I diverge from the majority/lead opinion——when Officer Oetzel returned to VanBeek's vehicle. The majority/lead opinion concludes that "VanBeek was seized during the second round of repetitive questions while Oetzel retained her driver's license." Majority/lead op., ¶50. I disagree because there are no facts in the record that demonstrate that the otherwise consensual encounter between Officer Oetzel and VanBeek transformed into an impermissible seizure.

¶90 An officer can ask questions and retain identification of an individual without that encounter transforming into a seizure. See Griffiths, 236 Wis. 2d 48, ¶39 (citing Bostick, 501 U.S. at 434-35). This includes if the officer asks follow-up questions. See I.N.S. v. Delgado, 466 U.S. 210, 216 (1984). As the United States Supreme Court has explained, "[u]nless the circumstances of the encounter are so intimidating as to demonstrate that a reasonable person would have believed he was not free to leave if he had not responded, one cannot say that the questioning resulted in a detention under the Fourth

---

line rules are disfavored). Instead of a bright-line rule, as the concurrence essentially suggests, the proper inquiry is whether, under the totality of the circumstances, a reasonable person would have felt free to terminate the encounter and go about their business. See Florida v. Bostick, 501 U.S. 429, 439 (1991).

6

Amendment." Id.[5] Only "if the person[] refuses to answer and the police take additional steps . . . to obtain an answer, then the Fourth Amendment imposes some minimal level of objective justification to validate the detention or seizure." Id. at 216-17. Accordingly, either the circumstances must be so intimidating that the questioning would cause a reasonable person to believe that she was not free to leave if she had not responded, or the police must take additional steps to obtain an answer after a refusal to answer for the interaction to transform from a consensual encounter into a Fourth Amendment seizure. We have neither in this case.

¶91 Here, the only circumstances that the majority/lead opinion points to are that Officer Oetzel retained VanBeek's driver's license and continued to ask repetitive questions. Majority/lead op., ¶50. However, repeated questioning is permissible under the Fourth Amendment so long as the circumstances are not "so intimidating as to demonstrate that a reasonable person would have believed he was not free to leave if he had not responded." Delgado, 466 U.S. at 216. Thus, Officer Oetzel's retention of the driver's license must have been "so intimidating" that a reasonable person in VanBeek's position would not have felt free to terminate the encounter and go about her business. But a reasonable person is willing to

---

[5] The formulation of the reasonable person test evolved to its current form after I.N.S. v. Delgado, 446 U.S. 210 (1984): Whether an innocent, reasonable person would have felt free to terminate the encounter and go about their business. See Bostick, 501 U.S. at 439.

7

ask for the return of their identification. See, e.g., United States v. Weaver, 282 F.3d 302, 312 (4th Cir. 2002) (holding that the defendant was free to request his license be returned to him so that he could end the encounter). VanBeek could have requested that Officer Oetzel return her identification, and she could have gone about her business. Id. However, she chose not to. Instead, she "nonetheless remain[ed] in police presence, perhaps because of a desire to be cooperative." Young, 294 Wis. 2d 1, ¶37. Accordingly, Officer Oetzel's retention of VanBeek's identification was not "so intimidating" that VanBeek could not have requested the return of her identification and terminated the encounter.

¶92 Moreover, the majority/lead opinion relies heavily on the fact VanBeek would not have been able to terminate the encounter and leave the scene because she needed her license to lawfully operate her vehicle. Majority/lead op., ¶45. However, this reliance is misplaced. The test for a seizure is not whether a person would feel free to leave the scene; rather, the proper inquiry is whether a person would feel free to terminate the encounter and go about their business. See Bostick, 501 U.S. at 439. As I explained above, VanBeek's "business" when Officer Oetzel arrived was sitting in her vehicle with her passenger. Although she expressed an interest in leaving the scene, this was not her "business." Consequently, Officer Oetzel's retention of her driver's license in no way impeded her ability to go about the business of sitting in her vehicle with her passenger.

8

¶93 Accordingly, based on the totality of the circumstances, VanBeek was not seized when Officer Oetzel returned to her vehicle, asked follow-up questions, and retained her identification. Officer Oetzel's questioning and retention of VanBeek's identification was not sufficiently intimidating to render mandatory compliance and transform the encounter into a seizure. VanBeek could have asked for the return of her identification, but she never did, "perhaps because of a desire to be cooperative." Young, 294 Wis. 2d 1, ¶37. Moreover, VanBeek did not need her license to go about her business— namely, sitting in her vehicle with her passenger.

¶94 Because VanBeek was not seized, the circuit court did not err when it denied VanBeek's motion to suppress.

## II. CONCLUSION

¶95 While I agree with the majority/lead opinion's conclusion that VanBeek was not seized when Officer Oetzel took her driver's license to his squad car and ran a warrant check, see majority/lead op., ¶45, I write separately because VanBeek was not seized when Officer Oetzel returned to VanBeek's vehicle and continued asking her follow-up questions. When looking at the totality of the circumstances, it is clear that VanBeek was free to ask for her driver's license back and end the interaction. Consequently, her encounter with Officer Oetzel was consensual, and she was not seized.

¶96 Accordingly, I respectfully dissent.

¶97 I am authorized to state that Justices REBECCA GRASSL BRADLEY and BRIAN K. HAGEDORN join this dissent.

9