# COURT OF APPEALS OF WISCONSIN
## PUBLISHED OPINION

Case No.: 2021AP939-CR

Complete Title of Case:

**STATE OF WISCONSIN,**

**PLAINTIFF-RESPONDENT,**

**V.**

**JERE J. MEDDAUGH,**

**DEFENDANT-APPELLANT.**

---

| | |
|---|---|
| Opinion Filed: | February 17, 2022 |
| Submitted on Briefs: | January 20, 2022 |

---

| | |
|---|---|
| JUDGES: | Blanchard, P.J., Kloppenburg, and Fitzpatrick, JJ. |
| Concurred: | |
| Dissented: | |

---

| | |
|---|---|
| Appellant ATTORNEYS: | On behalf of the defendant-appellant, the cause was submitted on the briefs of *Jefren E. Olsen*, assistant state public defender of Madison. |
| Respondent ATTORNEYS: | On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Jennifer L. Vandermeuse*, assistant attorney general, and *Joshua L. Kaul*, attorney general. |

# COURT OF APPEALS
# DECISION
# DATED AND FILED

## February 17, 2022

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

**This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.**

**A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals.** *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.     **2021AP939-CR**

STATE OF WISCONSIN

Cir. Ct. No.  2020CF313

**IN COURT OF APPEALS**

---

STATE OF WISCONSIN,

   PLAINTIFF-RESPONDENT,

V.

JERE J. MEDDAUGH,

   DEFENDANT-APPELLANT.

---

APPEAL from a judgment of the circuit court for Wood County: GREGORY J. POTTER, Judge. *Reversed and cause remanded with directions*.

Before Blanchard, P.J., Kloppenburg, and Fitzpatrick, JJ.

¶1     BLANCHARD, P.J. Jere Meddaugh appeals a judgment of conviction for possession of methamphetamine with intent to deliver, challenging the circuit court's denial of his motion to suppress evidence obtained as a result of an investigatory stop by a deputy sheriff. Meddaugh argues that the deputy lacked

reasonable suspicion to stop Meddaugh as he rode a bicycle on a city sidewalk and therefore violated the Fourth Amendment. Based on events that occurred following the stop, Meddaugh was arrested and ultimately convicted. We agree with Meddaugh that the State failed to show that the investigatory stop was supported by reasonable suspicion. Accordingly, we reverse the judgment and the court's denial of the suppression motion.

## BACKGROUND

¶2      Testimony by a Wood County deputy sheriff was the only evidence offered by either party at the suppression hearing. The circuit court fully credited the deputy's testimony and neither party argues that the court clearly erred in any aspect of its fact finding. We now summarize the testimony.

¶3      The deputy was patrolling in a marked squad car in the city of Wisconsin Rapids during the early morning hours of Sunday, April 26, 2020. At approximately 12:39 a.m., he noticed a flashing red light moving across a "large, asphalt playground" that adjoined an elementary school building.

¶4      The deputy drove toward the light by passing through an open gate and onto a driveway at one end of the playground area.[1] He was able to see that the light was attached to a bicycle being pedaled across the playground area by an

---

[1] Based on the deputy's testimony, the playground area included driveways at both ends for vehicles to enter and exit, though the driveway at the opposite end from where the deputy entered the area was blocked by a cable strung between two posts.

individual who was later identified to be Meddaugh.[2]  The bicycle was moving away from the deputy's squad car.  Meddaugh wore black clothing.

¶5      The deputy drove in the direction of the bicycle, closing the distance between them.  When the squad car came within approximately 20 feet, the deputy turned on the squad car's spotlight and pointed it at Meddaugh.  Meddaugh continued to pedal.  The deputy drew the squad car up parallel to the bicycle, leaving about 15 feet of space between them.  Meddaugh looked in the direction of the deputy and "waved with his hand up in the air."  Through the squad car's open window, the deputy "yelled for [Meddaugh] to stop."  Meddaugh did not stop. Instead, he continued in the same direction, traveling at "a normal pace."

¶6      As the squad car and bicycle moved in parallel, the space for vehicle traffic on the playground area began to narrow.  The deputy allowed Meddaugh to proceed in front of him and the deputy trailed behind him.

¶7      Continuing in the same direction, Meddaugh left the playground area by riding around two posts with a cable strung between them at the end of a driveway.  Still riding the bicycle, Meddaugh crossed one city street and then rode onto the sidewalk of a different street.  The deputy followed him by driving around the posts and cable, crossing the same street that Meddaugh had, and continuing on in the same direction as Meddaugh.  On the next street's sidewalk, Meddaugh continued to ride the bicycle in the same direction.

---

[2] As context for his observations of Meddaugh, the deputy testified that a statewide, emergency pandemic-related order was then in effect, which the deputy perceived had generally reduced the number of people who were out and about in Wisconsin Rapids at any given time.

¶8      The deputy drove on the street and reached a point ahead of where Meddaugh was riding.[3]  The deputy directed the spotlight at him, either for a second time or perhaps having continued to do so since they were both in the playground area.  Meddaugh stopped and got off the bicycle.  The deputy got out of the squad car and announced that he was a law enforcement officer.

¶9      It was at this moment, the parties now agree, that the deputy seized Meddaugh for purposes of the Fourth Amendment.  As discussed below, Meddaugh seeks to suppress all evidence obtained as a result of this seizure on the ground that the deputy lacked reasonable suspicion to seize him.

¶10     Based on events that occurred after the challenged seizure, Meddaugh was arrested near the scene of the stop, shortly after the stop.  A search of his person revealed suspected contraband and Meddaugh was charged with various crimes.  In the circuit court, Meddaugh moved to suppress all evidence obtained during or as a direct result of his seizure by the deputy.  The court denied the motion.  Based on Meddaugh's plea of no contest to one count of possession of methamphetamine with intent to deliver, the court adjudicated him guilty and sentenced him.  Meddaugh now appeals the suppression ruling.  *See* WIS. STAT. § 971.31(10) (2019-20) (allowing review of order denying motion to suppress evidence upon appeal of final judgment notwithstanding defendant's entry of plea of guilty or no contest).

---

[3] Both sets of briefing on appeal state that, at this point, the deputy drove his squad car on the street ahead of Meddaugh, who was riding the bicycle on the sidewalk.  The deputy's testimony on this point was somewhat ambiguous: "I drove up, potentially, ahead of him."  In any case, it does not affect our analysis whether the deputy actually drove ahead of Meddaugh or did not drive quite that far relative to Meddaugh.

**DISCUSSION**

¶11 On appeal, Meddaugh argues that the deputy lacked reasonable suspicion to conduct the investigatory stop, violating his Fourth Amendment rights. We agree.

¶12 We review an order granting or denying a motion to suppress evidence as an issue "'of constitutional fact.'" *State v. Howes*, 2017 WI 18, ¶17, 373 Wis. 2d 468, 893 N.W.2d 812 (quoted source omitted). This creates "'a two-step inquiry.'" *Id.* (quoted source omitted). "First, we will uphold the circuit court's findings of fact unless they are clearly erroneous," and "[a] finding of fact is clearly erroneous if it is against the great weight and clear preponderance of the evidence." *State v. Anderson*, 2019 WI 97, ¶20, 389 Wis. 2d 106, 935 N.W.2d 285. "Second, we review the application of constitutional principles to those facts independently of the decision[] rendered by the circuit court …." *Id.*

¶13 An investigatory stop, or *Terry* stop,[4] "complies with the Fourth Amendment 'if the police have reasonable suspicion that a crime has been committed, is being committed, or is about to be committed.'" *State v. Genous*, 2021 WI 50, ¶7, 397 Wis. 2d 293, 961 N.W.2d 41 (quoted source omitted). "Reasonable suspicion requires that a police officer possess specific and articulable facts that warrant a reasonable belief that criminal activity is afoot." *State v. Young*, 2006 WI 98, ¶21, 294 Wis. 2d 1, 717 N.W.2d 729. "While it is a low bar, a mere hunch is insufficient." *Genous*, 397 Wis. 2d 293, ¶8. Reasonable suspicion is determined "based on the totality of the circumstances," with the "focus not on isolated, independent facts, but on 'the whole picture' viewed together." *Id.*, ¶9

---

[4] *See* *Terry v. Ohio*, 392 U.S. 1 (1968).

(quoted source omitted). The State bears the burden of proving that an investigative stop was a constitutional seizure of the person. *See State v. Blatterman*, 2015 WI 46, ¶17, 362 Wis. 2d 138, 864 N.W.2d 26.

¶14 To repeat, the parties agree that the deputy stopped Meddaugh, constituting a seizure for purposes of the Fourth Amendment, no later than when the deputy got out of the squad car and announced that he was law enforcement, which was after the deputy drove ahead of Meddaugh with the spotlight trained on him, and after Meddaugh had gotten off the bicycle. We agree with the parties that this constituted a seizure. *See State v. Powers*, 2004 WI App 143, ¶8, 275 Wis. 2d 456, 685 N.W.2d 869 (determining when an officer seized a person for Fourth Amendment purposes based when the officer made a "'show of authority'" and when the person "'actually yield[ed]'" as a result (quoted source omitted)). This obligates us to limit our consideration to events that occurred before the moment of the stop. *See State v. VanBeek*, 2021 WI 51, ¶25, 397 Wis. 2d 311, 960 N.W.2d 32 ("When a seizure is claimed to have occurred, we first determine when it began and whether it was constitutionally permissible *at its inception*." (emphasis added)).

¶15 Considering the totality of the circumstances, we conclude that the State failed to clear the "low bar" of reasonable suspicion and instead relied on what could be described, at most, as "a mere hunch" of the deputy. *See Genous*, 397 Wis. 2d 293, ¶8. That is, the evidence regarding events leading up to the stop fails to establish articulable facts and rational inferences from those facts that could have led a reasonable officer to suspect that Meddaugh had engaged in criminal activity, was currently doing so, or was about to do so. *See Young*, 294 Wis. 2d 1, ¶21.

¶16 In a nutshell, the deputy observed an individual wearing black clothing and riding a bicycle, crossing and then leaving publicly accessible school

grounds in the early hours of a Sunday morning, while the state was under the Wisconsin Department of Health Services' Safer at Home order due to the COVID-19 pandemic.[5]  We now explain why we conclude that none of the facts or circumstances here meaningfully contributed to reasonable suspicion, so that the facts as a totality could not constitute reasonable suspicion.  Along the way we address the State's contrary arguments.

¶17    We begin with the fact that Meddaugh wore only black clothing.  It is true that in some circumstances the way that a person who is observed by police is dressed can contribute to reasonable suspicion.  *See **State v. Matthews***, 2011 WI App 92, ¶11, 334 Wis. 2d 455, 799 N.W.2d 911 (police had reasonable suspicion to conduct an investigatory stop of a man wearing a ski mask and hoodie late at night in a high-crime area who had an "unusual" encounter with a woman he walked past).  However, here Meddaugh's black clothing does not meaningfully contribute to reasonable suspicion because a flashing red light was attached to the bicycle and because he rode out in the open in a public space, making his presence easily detectable.  Further draining the black clothing of any possible suspicious character are the facts that Meddaugh did not attempt to evade or hide from the deputy when the deputy first made contact with Meddaugh and that he waved at the deputy and maintained a "normal" bicycle-riding pace.  To generalize our point somewhat, if the asserted significance of a person's dark clothing would involve a potential attempt at self-concealment, then there must be some other potential indicia of an attempt to hide or not to be noticed, and here there were no other indicia.

---

[5] *See* Emergency Order No. 28, DHS (Apr. 16, 2020) ("Safer at Home Order") (https://evers.wi.gov/Documents/COVID19/EMO28-SaferAtHome.pdf).  Although not relevant to our analysis, we note for context that, after events relevant to this appeal, our supreme court ruled that the Safer at Home order is unenforceable.  ***Wisconsin Legislature v. Palm***, 2020 WI 42, ¶¶3, 7, 391 Wis. 2d 497, 942 N.W.2d 900.

¶18    On the topic of the school grounds location, the circuit court concluded that it was itself suspicious that the deputy first spotted and encountered Meddaugh as he rode across the school grounds. This was so, the court said, because that placed him "where no one should be around at that time of the day." We interpret the court to have drawn a legal conclusion weighing in favor of reasonable suspicion from the fact that Meddaugh rode across the school grounds on a bicycle in the middle of the night. If so, this legal conclusion is unsupported by the evidence. The deputy could no doubt rely on the assumption that the school building was closed and not being used for any ordinary function by anyone at that hour. However, the record contains no evidence that Meddaugh was illegally on the school grounds at that time, or that, even if riding across the grounds was permitted by law, a reasonable officer might have viewed it as suspicious because it was unsafe or in some other way improper. That is, there was no evidence suggesting that Meddaugh was not allowed to cross the school yard by some formal or informal rule, notice, or understanding, or that it appeared unsafe to do so. Indeed, the deputy testified that he was not aware of any posted signs to the effect that the playground area was closed to the public at certain hours, and there was no evidence that riding across the school grounds could reasonably have been considered unsafe or improper for any reason.

¶19    The State argues that, even though Meddaugh was not evidently violating any law in riding where and when he did, doing so nevertheless contributed to reasonable suspicion. To be sure, the fact that certain kinds of activities (even activities that in themselves may not violate the law) take place in high-crime areas can contribute to reasonable suspicion that criminal activity is afoot. S*ee Matthews*, 334 Wis. 2d 455, ¶11. Here, however, the only evidence was that Meddaugh was *not* traveling from, through, or toward a high-crime area. The

8

deputy testified that he had not received any reports of vandalism or suspicious activity around the school.[6]

¶20    We turn to the topics of the Safer at Home order and the COVID-19 pandemic.  The parties agree specifically that Meddaugh was not violating the Safer at Home order by bicycling alone in the middle of the night.  They also agree generally that the order allowed for individuals to be outside their residences under various sets of circumstances defined in the order.  Further, the State does not argue that the deputy reasonably but incorrectly believed that Meddaugh's conduct violated the order or that such a belief could itself contribute to reasonable suspicion that Meddaugh had engaged, was engaging, or was about to engage in criminal activity.

¶21    What remains on this topic is the deputy's testimony that relatively fewer people than usual were outside their residences in Wisconsin Rapids and the State's general observation now on appeal that "[c]ircumstances deriving from the … pandemic, coupled with other factors, can give rise to reasonable suspicion." This general observation has no solving power here; we need not consider hypotheticals that could involve suspicious conduct in the context of the pandemic and related government guidance or orders.[7]  Here, nothing about the Safer at Home

---

[6] To the extent that the circuit court may have intended to make a factual finding that Meddaugh's riding across the open playground area placed him "where no one should be around at that time of the day," this would be clear error because it is not supported by a reasonable view of the evidence for the reasons just explained in the text.

[7] For example, completely distinguishable is a federal case to which the State directs us as an example of when pandemic-related circumstances can contribute to reasonable suspicion to justify an investigative stop.  *See U.S. v. Sanchez*, No. 21-CR-1040 KG, 2021 WL 5003442 (D.N.M. Oct. 28, 2021).  In *Sanchez*, a law enforcement officer noticed that an individual on a mostly vacant Greyhound bus was sitting immediately next to another passenger whom the individual claimed not to be traveling with.  *Id.* at *1.  Reasonable suspicion arose in part due to

order or the pandemic adds to reasonable suspicion. The mere fact that there were fewer people outside due to the pandemic or the Safer at Home order does not support a conclusion that those who were outside might commit or plan to commit crime—and certainly not a solitary bicyclist riding in an ordinary manner through an area where, at least so far as the evidence here shows, the public had a right to freely travel.

¶22　The State argues that the time of day weighed in favor of reasonable suspicion. More specifically, we understand the State to pair the timing and location topics to argue that together they contributed to reasonable suspicion. Depending on the specific context and types of potential criminal activities at issue, the time of day may contribute to reasonable suspicion. *See State v. Post*, 2007 WI 60, ¶36, 301 Wis. 2d 1, 733 N.W.2d 634 (time of day can add to reasonable suspicion in driving-while-intoxicated cases when an officer observes poor driving around the time that bars close). But here there is no evidence suggesting that the time of day in these circumstances could add to the reasonable suspicion of past, current, or planned criminal activity. The fact that it was 12:39 a.m. might have been relevant, for example, if the deputy had come upon a person seemingly lurking behind shrubs or other objects near a closed building. But all we have here is a person riding across open school grounds on a bicycle with an attached blinking red light.[8]

---

this proximity in light of the pandemic. *See id.* at \*1-3. Part of the reasoning accepted by the court was, why sit so close to someone you claim not to know in a pandemic? In contrast here, the deputy provided no testimony that could support a rational inference that Meddaugh's activity could fall within this sitting-too-close-during-a-pandemic rationale.

[8] We observe that, in arguing that the time of day here contributed to reasonable suspicion, the State relies on inapposite case law that involves the issue of whether an officer, for safety reasons, had reasonable suspicion to *frisk* an individual. *See State v. Kyles*, 2004 WI 15, ¶58, 269 Wis. 2d 1, 675 N.W.2d 449 (finding that the hour of the day may be relevant to establishing

¶23     We now turn to the fact that Meddaugh did not stop riding when the deputy yelled "stop." This also does not provide an articulable fact reinforcing reasonable suspicion because reasonable suspicion did not exist prior to this moment. *See Young*, 294 Wis. 2d 1, ¶73 ("Where a police officer, 'without reasonable suspicion or probable cause, approaches an individual, the individual has a right to ignore the police and go about his [or her] business.'" (emphasis and quoted source omitted)). Because the deputy did not have reasonable suspicion to make an investigatory stop when he yelled "stop," it would have been unreasonable under the Fourth Amendment for the deputy to attach any significance to the fact that Meddaugh continued to ride. Notably, in maintaining the same "normal" pedaling pace and continuing in the same direction, Meddaugh took no evasive action and gave no otherwise suspicious reaction to the presence and actions of the deputy.[9]

¶24     The State points out that the lack of a clear violation of the law does not automatically defeat reasonable suspicion. *See State v. Waldner*, 206 Wis. 2d 51, 60, 556 N.W.2d 681 (1996) ("When a police officer observes lawful but

---

reasonable suspicion for an officer to frisk an individual); *State v. Morgan*, 197 Wis. 2d 200, 214, 539 N.W.2d 887 (1995) (explaining that the time of day may contribute to reasonable suspicion for a frisk). The issue here is whether the deputy had reasonable suspicion to conduct the challenged investigatory stop, which necessarily had to occur before there was even the potential for a frisk. In any case, the State does not point to any evidence that the deputy could have reasonably believed that Meddaugh was a danger to the deputy at any time before the challenged investigatory stop. Stepping back, some of the same factors, such as the time of day, can be relevant to both a reasonable-suspicion-to-frisk analysis and a reasonable-suspicion-for-investigatory-stop analysis, depending on the circumstances. But here the time of day does not contribute to reasonable suspicion for the reasons explained in the text.

[9] The State asserts that Meddaugh's continuing to pedal in the same direction and at the same pace after he acknowledged the deputy with a hand wave can still support the inference that Meddaugh was attempting to "evade" the deputy. Whatever the State precisely means, the point apparently rests on a premise that we reject for the reasons stated in the text. The inaccurate premise is that there was *other* evidence supporting reasonable suspicion that was "reinforced" by Meddaugh's continuing to ride.

suspicious conduct, if a reasonable inference of unlawful conduct can be objectively discerned … police officers have the right to temporarily detain the individual for the purpose of inquiry."). But this observation does the State no good in this case for the reasons we have explained. Police lack reasonable suspicion to justify an investigatory stop if there are not specific, articulable facts, and all rational inferences that may be drawn from those facts, to suspect that criminal activity is afoot. *See Young*, 294 Wis. 2d 1, ¶21.

¶25 Turning to our mandate and remedies, the parties have not given us detailed arguments as to what this court should direct on remand in the event that we reverse the circuit court's denial of Meddaugh's suppression motion. Meddaugh asserts that we should reverse the judgment of conviction and remand to the circuit court with instructions that the judgment be vacated, that Meddaugh's suppression motion be granted, and that all evidence obtained as a result of the search be suppressed, but without purporting to describe the scope of that evidence as it relates to particular charges. The State does not address these issues at all. We direct the circuit court to vacate the judgment of conviction and grant the motion to suppress. It will be for the circuit court following remand to address any arguments of the parties as to the scope of evidence that must be suppressed, the effect on each charge in the case, and further proceedings in this case aside from the requirement that the circuit court vacate the judgment and grant the motion to suppress based on the reasoning in this opinion.

*By the Court*.—Judgment reversed and cause remanded with directions.