COURT OF APPEALS
DECISION
DATED AND FILED

December 20, 2022

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No. 2021AP311-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2018CF5172

IN COURT OF APPEALS
DISTRICT I

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

DONTE QUINTELL MCBRIDE,

DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Milwaukee County: JONATHAN D. WATTS, Judge. *Reversed and cause remanded with directions.*

Before Donald, P.J., Dugan and White, JJ.

¶1 DONALD, P.J. Donte Quintell McBride appeals a judgment of conviction for one count of possession with intent to deliver heroin and two counts of possession with intent to deliver narcotics, and an order denying his motion to

suppress. As discussed below, we conclude that the police did not have reasonable suspicion to seize McBride. Accordingly, we reverse the judgment and the circuit court's denial of McBride's suppression motion.

## BACKGROUND

¶2 On October 28, 2018, McBride and another person were sitting in an SUV parked in an alley behind the building where McBride lived. McBride was in the passenger seat.

¶3 At approximately 11:15 p.m., Officer Jose Rivera and his partner, Officer Eric Kradecki, were performing a routine patrol and spotted the SUV. Within a matter of seconds, Officer Rivera shined the squad spotlight into the SUV, exited the squad car, and ordered the driver and McBride to put their hands up. Officer Rivera then opened the passenger's side door, handcuffed McBride, and removed him from the SUV. When Officer Rivera opened the SUV door, he saw an orange, unlabeled pill bottle between the front passenger door and the seat. An additional unlabeled pill bottle was recovered from McBride's front right pocket after a pat-down.[1]

¶4 McBride was charged with one count of possession with intent to deliver heroin and one count of possession of narcotic drugs. An amended information added a second count of possession of narcotic drugs and second and subsequent enhancers to all counts.

---

[1] At the preliminary hearing, Officer Rivera testified that he also recovered a clear plastic bag from McBride that he believed was heroin.

¶5    McBride filed a motion to suppress.  At the suppression hearing, Officer Rivera testified, and the State moved the video footage from his body camera into evidence.  According to Officer Rivera, upon shining the spotlight into the SUV, McBride, who was in the passenger seat, immediately "started to bend down towards his waist area and begin to reach around in the vehicle." Further, as Officer Rivera exited his squad car, McBride was "still reaching inside of the vehicle."  Officer Rivera admitted, however, that neither his body camera nor his partner's body camera captured any movement from McBride.[2]

¶6    Officer Rivera also testified that the SUV was not "parked off to the side, it was parked right in the alley," and could have interfered with traffic if there was a large vehicle or two-way traffic.  On cross-examination, Officer Rivera, however, indicated that he was able to maneuver his vehicle around the SUV, and that he did not take measurements of the alley to determine whether the SUV in fact obstructed traffic.

¶7    Following the suppression hearing, the circuit court denied the motion.  The circuit court found Officer Rivera's testimony credible.  The circuit court further found that there was reasonable suspicion for the stop and subsequent frisk, and probable cause existed to arrest McBride.

¶8    That same day, McBride pleaded guilty to one count of possession with intent to deliver heroin and two counts of possession with intent to deliver narcotics.  McBride was sentenced to a total of six years in prison.  McBride now appeals the suppression ruling.  Additional relevant facts are addressed below.

---

[2] According to Officer Rivera, this was because the body camera was at a fixed angle; whereas, he could move his head and see different things.

3

**DISCUSSION**

¶9    On appeal, McBride renews his argument that police did not have reasonable suspicion to seize him.  McBride also contends that handcuffing and removing him from the vehicle was not supported by reasonable suspicion and exceeded the scope of a permissible stop.  Finally, McBride contends that the search of his person was not justified.

¶10    We conclude that the police lacked reasonable suspicion to seize McBride.  As a result, we do not address McBride's other issues.  *See State v. Blalock*, 150 Wis. 2d 688, 703, 442 N.W.2d 514 (Ct. App. 1989) (stating that an appellate court should decide cases on the narrowest possible grounds).

¶11    The Fourth Amendment to the United States Constitution and Article I, Section 11 of the Wisconsin Constitution protect the rights of citizens to be free from unreasonable searches and seizures.  *State v. Young*, 2006 WI 98, ¶18, 294 Wis. 2d 1, 717 N.W.2d 729.  An investigatory stop, also known as a *Terry* stop,[3] "complies with the Fourth Amendment 'if the police have reasonable suspicion that a crime has been committed, is being committed, or is about to be committed.'"  *State v. Genous*, 2021 WI 50, ¶7, 397 Wis. 2d 293, 961 N.W.2d 41 (citation omitted).

¶12    "Reasonable suspicion requires that a police officer possess specific and articulable facts that warrant a reasonable belief that criminal activity is afoot."  *Young*, 294 Wis. 2d 1, ¶21.  This is "an objective test that examines the totality of circumstances."  *State v. VanBeek*, 2021 WI 51, ¶52, 397 Wis. 2d 311,

---

[3] *See Terry v. Ohio*, 392 U.S. 1 (1968).

960 N.W.2d 32. "A mere hunch that a person has been, is, or will be involved in criminal activity is insufficient" to establish reasonable suspicion. *Young*, 294 Wis. 2d 1, ¶21.

¶13 The State bears the burden of proving that an investigatory stop was constitutional. *State v. Meddaugh*, 2022 WI App 12, ¶13, 401 Wis. 2d 134, 972 N.W.2d 181. When reviewing an order granting or denying a motion to suppress, we will uphold the circuit court's findings of fact unless they are clearly erroneous. *Id.*, ¶12. We independently apply constitutional principles to the facts. *Id.*

¶14 Here, the parties agreed in the circuit court that a seizure occurred when Officer Rivera ordered McBride to show his hands. *See Young*, 294 Wis. 2d 1, ¶34 (stating that a seizure occurs when a reasonable person would have believed he was not free to leave). As a result, at issue is whether the police had reasonable suspicion to seize McBride. *See Genous*, 397 Wis. 2d 293, ¶7. The State contends that the totality of the circumstances support a finding of reasonable suspicion. We disagree. We conclude that the totality of circumstances does not establish reasonable suspicion that McBride had been engaged in, was engaged in, or was about to be engaged in, criminal activity.

¶15 To start, we note what this case is *not* about. This is not a case where the police were responding to a call or tip about suspicious or criminal activity taking place. Nor is this a case where the police came across a person, had a hunch that criminal activity was taking place, and then, after observing the person for a substantial period of time, determined that criminal activity appeared to be afoot. Rather, in this case, we emphasize that the record reflects that the

officers were on a routine patrol and, seconds after observing the SUV, seized McBride.

¶16    In concluding that reasonable suspicion existed to seize McBride, the circuit court highlighted that:  (1) the SUV was parked in a "high-crime" area; (2) the SUV had its lights off;[4] (3) there were two people sitting inside the SUV; (4) the SUV was parked in an "unusual" place in the alley; and (5) McBride moved in response to seeing Officer Rivera's spotlight.[5]

¶17    First, as the State acknowledges, it is well-established that an individual's presence in a high-crime area standing alone is insufficient to give rise to reasonable suspicion.  *See State v. Gordon*, 2014 WI App 44, ¶15, 353 Wis. 2d 468, 846 N.W.2d 483.  The State cannot justify a warrantless search or seizure with nothing more than a recitation that the person was in a "high-crime" area.  As we have previously observed:

> sadly, many, many folks, innocent of any crime, are by circumstances forced to live in areas that are not safe— either for themselves or their loved ones.  Thus, the routine mantra of "high crime area" has the tendency to condemn a whole population to police intrusion that, with the same additional facts, would not happen in other parts of our community.

*Id.*

---

[4] Both Officer Jose Rivera and the circuit court simply referred to "lights."  Neither specified whether this meant the SUV's headlights or interior lights.

[5] We note that the circuit court in its decision also referred to the discovery of the unlabeled pill bottle in the SUV.  Reasonable suspicion, however, must be facts and information known to the police officer before the seizure.  *See State v. Genous*, 2021 WI 50, ¶10, 397 Wis. 2d 293, 961 N.W.2d 41.

¶18     Second, we are not persuaded that two people sitting in a parked SUV with its lights off is inherently suspicious.  Sitting in a parked car with the lights off cannot be described as unusual or uncommon behavior in either high-crime or low-crime areas.  There are a plethora of innocent reasons that two people may sit in a parked car, such as waiting for a friend or family member.  While it is true that conduct which may have an innocent explanation may also give rise to a reasonable suspicion of criminal activity, the inference of unlawful conduct must be reasonable.  *See State v. Waldner*, 206 Wis. 2d 51, 57, 556 N.W.2d 681 (1996).  Here, we do not see how the presence of two people in the parked SUV without its lights on supports a reasonable suspicion that McBride was engaged in criminal activity.

¶19     Third, we address McBride's alleged movements in response to Officer Rivera's squad spotlight shining into the SUV.  "Furtive" or suspicious movements do not automatically give rise to reasonable suspicion.  For instance, in *Gordon*, officers stopped the defendant, who was walking at night in a high-crime area, after observing him pat the outside of his pants pocket, also known as a "security adjustment."  *See id.*, 353 Wis. 2d 468, ¶¶9, 14.  One of the officers explained that a "security adjustment" is a conscious or unconscious movement that an individual does when he or she is carrying a weapon and confronted by law enforcement.  *Id.*, ¶4.  Nonetheless, we concluded that, without more, the facts did not establish reasonable suspicion that criminal activity was afoot.  *Id.*, ¶14.  We stated that a "'security adjustment' could, given additional facts (such as, for example, flight or attempted flight), support an objective 'reasonable suspicion,'" the additional facts present were "far too common to support the requisite individualized suspicion[.]" *Id.*, ¶17.

7

¶20 Here, Officer Rivera admitted that neither his body camera nor his partner's body camera captured any movement from McBride. Nor do we discern any clear movement based on our review of the body camera recording. However, even accepting the circuit court's findings that Officer Rivera saw movement, we conclude that this does not establish reasonable suspicion that criminal activity was afoot. If anything, McBride's movement in response to a bright spotlight being shined into the car is far less suspicious than the "security adjustment" in *Gordon*. *Id.*; *see also* **State v. Johnson**, 2007 WI 32, ¶43, 299 Wis. 2d 675, 729 N.W.2d 182 (noting that there are any number of "innocuous movements persons make in their vehicle every day," which might result in an officer seeing the occupant of a vehicle's "head and shoulders move, or even momentarily disappear from view," including reaching for a wallet, putting down a soda, or picking up a fast food wrapper from the floor). Permitting a seizure based on a person's movement in response to a bright spotlight shining into a car where the only other facts are that the area is high-crime and two people are sitting in a parked car with the lights off in an alley simply is not enough to establish reasonable suspicion.

¶21 Finally, we turn to the location of the SUV in the alley. The Dissent contends that the SUV was obstructing traffic in the alley, thus, the officers had reasonable suspicion that a traffic law was being violated. *See* Dissent, ¶36; **State v. Colstad**, 2003 WI App 25, ¶9, 260 Wis. 2d 406, 659 N.W.2d 394 (holding that an investigative stop was justified by reasonable suspicion that the defendant

8

had violated a traffic ordinance). The Dissent, however, does not specify what traffic law or ordinance was allegedly being violated.[6]

¶22 Moreover, based on our review of the testimony and the body camera video, we conclude that the circuit court's finding that the SUV "obstructed traffic" was clearly erroneous. *See Meddaugh*, 401 Wis. 2d 134, ¶12. The video reflects that the SUV was not in fact parked in the middle of the alley, but rather off to the side with the driver behind the wheel and available to move the SUV. Additionally, on cross-examination, Officer Rivera conceded that he was able to maneuver his squad car around the parked SUV and that he took no measurements of the alley to determine whether the SUV would have in fact obstructed traffic.

¶23 Therefore, under the totality of the circumstances, we conclude that the police lacked reasonable suspicion to seize McBride. Accordingly, we reverse the judgment and the circuit court's denial of the motion to suppress. On remand, we direct the circuit court to vacate the judgment, withdraw McBride's plea, grant the motion to suppress, and determine the effect of suppression on each of the charges in the case.

*By the Court.*—Judgment and order reversed and cause remanded with directions.

---

[6] The State's brief to this court references MILWAUKEE, WIS. TRAFFIC CODE, 101-24.2, which provides that it is "unlawful for any vehicle to be parked or left standing in a highway in such a manner as to obstruct traffic." We question whether this ordinance applies here. The plain language of the ordinance addresses vehicles on a *highway*, not an alley. *Cf.* MILWAUKEE, WIS. TRAFFIC CODE, 101-24.5(3) (discussing the removal of a vehicle from "any alley, street, highway or public place" when there is an issue with the vehicle identification number); 101-24.7(2)(a) (prohibiting an unregistered motor vehicle from being located upon "any alley, street, highway, public way or thoroughfare").

Not recommended for publication in the official reports.

**No. 2021AP311-CR(D)**

¶24 DUGAN, J. (*dissenting*). Because I conclude that: (1) the police officers had reasonable suspicion to stop the SUV McBride was a passenger in because the SUV was illegally parked obstructing traffic; (2) McBride was lawfully seized during the investigative stop for the traffic violation; (3) the officers lawfully ordered McBride to exit the SUV during the investigative stop; (4) under the totality of the circumstances, at the time Officer Rivera opened the car door and immediately saw the pill bottle that did not have a label and contained green pills that Officer Rivera believed were oxycodone, the officers had probable cause to arrest McBride for possession of a controlled substance without a prescription; and (5) the officers' search of McBride was incident to the lawful arrest, I respectfully dissent.[1]

## Officer Rivera's Testimony at the Suppression Hearing

¶25 Officer Rivera was the only witness to testify at the hearing on McBride's motion to suppress the evidence that was found after the SUV he was a passenger in was stopped. Thus, his testimony is critical in the analysis of the issues on appeal, and I highlight it in this dissent.

---

[1] As explained below, I disagree with the Majority's conclusion that the police officers did not have reasonable suspicion to seize McBride. The Majority analyzes the seizure issue from the standpoint of whether there was reasonable suspicion that McBride was committing a crime. My analysis focuses on the reasonable suspicion for the traffic stop, which then results, as it does in every traffic stop, with the occupants of the SUV being lawfully seized during the traffic stop.

1

¶26    Officer Rivera, who had almost twelve years of experience as a City of Milwaukee police officer, was assigned to the Anti-Gang Unit on October 28, 2018. His duties with the Anti-Gang Unit were to patrol high-crime areas, respond to shots fired, respond to reports of drug dealing, and things of that nature. At approximately 11:15 p.m. on October 28, 2018, he and his partner Officer Kradecki, were on patrol looking for any suspicious activity in the area around 416 East Locust Street in Milwaukee.

¶27    Officer Rivera testified that that location is a high-crime area where he had responded to many calls for service regarding shootings, shots fired, drug dealing, and things of that nature. He testified that he personally made over two dozen arrests regarding illegal drugs and firearm possession in that area.

¶28    Specific to this case, Officer Rivera stated that on the night in question, he saw a SUV parked in the alley with no lights on. He stated that alleys in Milwaukee are typically very narrow, so it caught his attention because it was not parked off to the side—it was parked right in the alley. He testified that the SUV was parked so that if there was a large vehicle or two-way traffic, the SUV would interfere with traffic. In response to trial counsel's question that "[i]n fact, in that vehicle if it's parked and no one is there, the solution would be just to ticket the vehicle, correct," Officer Rivera responded, "Yes. It would get ticketed or towed if it's obstructing traffic."

¶29    Officer Rivera then testified that to him "with it being dark out, the lights being off in the vehicle, with people inside the vehicle parked in an alley obstructing traffic, that was not normal, especially in a high-crime area which made him suspicious." He stated that because he could not tell if anyone was in the SUV, he shined his squad car spotlight at the SUV and he saw that there were

2

two people in it. Once the spotlight shined on the SUV, McBride immediately started to bend down towards his waist area and began to reach around in the SUV. Officer Rivera further testified that based on his experience and training and dealing with similar situations, McBride's movements were consistent with someone having illegal narcotics or weapons on their person. He explained that when those people see police, they try to hide the drugs and weapons. He also stated that in his experience, he had arrested people who had hidden controlled substances and weapons in their waistbands.

¶30 Officer Rivera testified that when he saw McBride make those movements, he got out of the squad car, saw that McBride was still making those movements, and so he ordered McBride and the driver to show him their hands—they complied. As Officer Rivera approached McBride while he was still in the SUV, Officer Rivera asked him what he was reaching around for—why was he reaching. Officer Rivera then opened the door, removed McBride from the SUV, and handcuffed him for the officers' safety because McBride's movements made him fear that McBride might be armed with a weapon. He then conducted a pat-down of McBride's person for weapons.

¶31 Officer Rivera also testified that when he opened the door, he immediately saw an orange pill bottle, without a label, that contained green pills located between McBride's seat and the door—he believed the pills were oxycodone. He testified that based on his training and experience that a pill bottle, without a label, was indicative of McBride possessing a controlled substance without a prescription and that when people normally carry prescription bottles, they have a label with their name on it, and there was no label on the pill bottle in the SUV. When the trial court asked Officer Rivera if he immediately saw that the pill bottle contained the green pills in it, Officer Rivera responded yes.

3

¶32    Officer Rivera testified that while he was patting McBride down for weapons, he recovered an additional pill bottle from McBride's front right pocket that did not have a label on it that contained more pills. McBride was arrested and subsequently charged with Possession with Intent to Deliver a Controlled Substance—Heroin—more than Three Grams but not more than Ten Grams[2] and with Possession of Oxycodone Hydrochloride, a Controlled Substance, without a valid prescription.

¶33    This dissent will address: (1) whether the police officers had reasonable suspicion to stop the SUV that McBride was a passenger in; (2) was McBride lawfully seized during the traffic stop; (3) did the officers lawfully order McBride to exit the SUV; (4) at the time that Officer Rivera opened the car door and saw the pill bottle with the green pills that he believed were oxycodone, did he have probable cause to arrest McBride; and (5) was the officers' search of McBride a search incident to his arrest. I will address each issue in turn.

**The Officers had Reasonable Suspicion to Justify the Stop**

¶34    In *State v. Genous*, 2021 WI 50, ¶¶7-9, 397 Wis. 2d 293, 961 N.W.2d 41, our supreme court concisely set forth the law regarding investigatory stops by police. The court stated:

> An investigatory stop, also known as a *Terry* stop, "usually involves only temporary questioning and thus constitutes only a minor infringement on personal liberty." *State v. Young*, 2006 WI 98, ¶20, 294 Wis. 2d 1, 717 N.W.2d 729. It allows police officers to briefly detain someone to "investigat[e] possible criminal behavior even though there is no probable cause to make an arrest."

---

[2] As the Majority notes, at the preliminary hearing, Officer Rivera testified that he also recovered a clear plastic bag from McBride that he believed contained heroin.

> *State v. Waldner*, 206 Wis. 2d 51, 55, 556 N.W.2d 681 (1996). This type of limited stop complies with the Fourth Amendment "if the police have reasonable suspicion that a crime has been committed, is being committed, or is about to be committed." *Young*, 294 Wis. 2d 1, ¶20.
>
> Reasonable suspicion must be supported by specific and articulable facts. *Id.*, ¶21. While it is a low bar, a mere hunch is insufficient. *Id.*; *State v. Eason*, 2001 WI 98, ¶19, 245 Wis. 2d 206, 629 N.W.2d 625. Yet "officers are not required to rule out the possibility of innocent behavior before initiating a brief stop." *State v. Anderson*, 155 Wis. 2d 77, 84, 454 N.W.2d 763 (1990). The question is, "What would a reasonable police officer reasonably suspect in light of his or her training and experience?" *Id.* at 83-84; *United States v. Cortez*, 449 U.S. 411, 418 (1981) ("[A] trained officer draws inferences and makes deductions ... that might well elude an untrained person.").
>
> A reasonable suspicion determination is based on the totality of the circumstances. *State v. Post*, 2007 WI 60, ¶18, 301 Wis. 2d 1, 733 N.W.2d 634. We focus not on isolated, independent facts, but on "the whole picture" viewed together. *Cortez*, 449 U.S. at 417-18; *see also United States v. Sokolow*, 490 U.S. 1, 9-10 (1989) ("Indeed, *Terry* itself involved a series of acts, each of them perhaps innocent if viewed separately, but which taken together warranted further investigation." (internal quotation marks omitted)).

*Genous*, 397 Wis. 2d 293, ¶¶7-9 (alterations in original; some citations omitted). The court then explained that when addressing a motion to suppress involving a stop the court's "task is to consider everything observed by and known to the officer, and then determine whether a reasonable officer in that situation would reasonably suspect that criminal activity was afoot."[3] *Id.*, ¶10. "Whether reasonable suspicion was present is a legal question we analyze independently, but

---

[3] I note that in *Genous*, the officer stopped Genous's vehicle based on a suspicion that he observed Genous engage in a drug transaction—not for a traffic violation. *See State v. Genous*, 2021 WI 50, ¶1, 397 Wis. 2d 293, 961 N.W.2d 41.

we accept the circuit court's findings of historical fact unless they are clearly erroneous." *Id.*

¶35     While on patrol, Officer Rivera turned into the alley at 11:15 p.m., and as he driving through the alley, he saw a SUV parked in the alley such that it was obstructing traffic.  McBride argues that Officer Rivera's testimony did not establish that the SUV in fact blocked traffic.  However, Officer Rivera testified that "[a]lleys typical in Milwaukee are very narrow, so it caught my attention because it wasn't parked off to the side, it was parked right in the alley."  He also testified that a large vehicle or two-way traffic would be obstructed.  When trial counsel asked Officer Rivera whether the SUV would get ticketed if no one was there, he responded, "Yes.  It would get ticketed and towed if it is obstructing traffic."

¶36     Moreover, in this case the trial court made specific findings that the SUV was obstructing traffic.  It stated in numerous parts of its oral decision that "the car is parked in the alley, not off to the side," "an unilluminated vehicle parked in the middle of the alley is suspicious," "so you have the improperly parked vehicle," "vehicle parked in the middle of the alley, obstructing traffic in the alley," and "discovery by Officer Rivera of a vehicle parked in the middle of the alley and having no lights on is suspicious."  As noted, "we accept the circuit

court's findings of historical fact unless they are clearly erroneous." *Genous*, 397 Wis. 2d 293, ¶10.[4]

¶37    I conclude that based on the facts in the record and the circuit court's findings of fact that the SUV was obstructing traffic in the alley, the officers had reasonable suspicion that a traffic law was being violated, which justified a traffic stop.    An officer may conduct an investigatory stop of a vehicle based on a noncriminal traffic violation.    *State v. Colstad*, 2003 WI App 25, ¶¶8-9, 260 Wis. 2d 406, 659 N.W.2d 394 (noting that when there is reasonable suspicion to believe a person is violating a law or a traffic ordinance, a police officer may, consistent with the Fourth Amendment's protection against unreasonable seizures, detain the person for an investigative stop).    In *State v. Neal*, No. 2017AP1397-CR, unpublished slip op. (WI App Apr. 3, 2018),[5] officers saw a vehicle parked in an alley blocking traffic.    The officers activated their squad lights, approached the vehicle, and asked the occupants to exit the vehicle.    *Id.*, ¶2.    This court concluded that the vehicle was "parked towards the middle of the alley, blocking traffic in at least one direction."    *Id.*, ¶11.    Accordingly, this court concluded that the stop was reasonable.    *Id.*

---

[4] The Majority notes that the circuit court stated that there was an "inference" that the SUV was "partially blocking the alley."    It goes on to say that on cross-examination, Officer Rivera conceded that he was able to maneuver his car around the parked SUV and that he took no measurements "to indicate whether the SUV in fact obstructed traffic."    Majority, ¶19.    First, although the circuit court did note the inference that the SUV was partially blocking the alley, in that same sentence it went on to say, "[T]here was later testimony that the vehicle could have been towed or ticketed …."    By contrast, as noted above, the circuit court found that the SUV was illegally parked, was parked in the middle of the alley, and was obstructing traffic.    We must accept the circuit court's findings of historical fact unless they are clearly erroneous.    *Genous*, 397 Wis. 2d 293, ¶10.

[5] This is an unpublished opinion.    Pursuant to Rules of Appellate Procedure, WIS. STAT. RULE 809.23(3)(b), unpublished opinions issued on or after July 1, 2009, may be cited for persuasive value.

¶38    Applying our supreme court's holding in *Genous*, I am persuaded by the reasoning of this court in the *Neal* decision and conclude that the officers reasonably stopped the SUV in which McBride was a passenger.

**Seizure and Removal from the SUV**

¶39    I next address the issue of whether the police officers had reasonable suspicion to detain—seize—McBride and remove him from the SUV. I conclude because the police officers had reasonable suspicion that the parked SUV was violating a traffic ordinance that they could conduct an investigative stop of the SUV based on that noncriminal violation, that they could also detain the occupants of the SUV for the duration of the investigative stop, and that they could order McBride and the driver to exit the SUV without violating the Fourth Amendment's prohibition against unreasonable seizures.

¶40    In *Arizona v. Johnson*, 555 U.S. 323, 327 (2009), the U.S. Supreme Court explained that "[f]or the duration of a traffic stop, we recently confirmed, a police officer effectively seizes 'everyone in the vehicle,' the driver and all passengers. *Brendlin v. California*, [551 U.S. 249, 255] (2007)." Thus, the Court stated that "we hold that, in a traffic-stop setting, the first *Terry* condition—a lawful investigatory stop—is met whenever it is lawful for police to detain an automobile and its occupants pending inquiry into a vehicular violation. *The police need not have, in addition, cause to believe any occupant of the vehicle is involved in criminal activity*." *Johnson*, 555 U.S. at 327 (emphasis added).

¶41    As noted above, in *Neal*, No. 2017AP1397-CR, this court was faced with facts similar to the facts in this case. Namely, officers saw a vehicle parked in an alley blocking traffic. In *Neal*, the officers activated their squad lights, approached the vehicle, and asked the occupants to exit the vehicle. *Id.*, ¶2. This

8

court concluded that the vehicle was obstructing traffic, and therefore, the stop was reasonable. *Id.*, ¶11. It also cited *Colstad* for the proposition that when there is a reasonable suspicion to believe a person is violating a law or a traffic ordinance, a police officer may, consistent with the Fourth Amendment's protection against unreasonable seizures, detain the person for an investigative stop. *Id.*

¶42    Thus, I conclude that because the SUV was obstructing traffic, the officers engaged in a lawful investigatory stop, and therefore, the officers could detain—seize—McBride and the driver for the investigative stop. *See Johnson*, 555 U.S. at 327.

¶43    The next issue I address is whether the officers could lawfully order McBride and the driver to exit the SUV. The U.S. Supreme Court decisions in *Arizona v. Johnson*, *Pennsylvania v Mimms*,[6] and *Maryland v. Wilson*,[7] hold that once a vehicle has been lawfully detained for a traffic violation, the police officers may order the driver and any passengers to exit the vehicle without violating the Fourth Amendment's prescriptions of unreasonable searches and seizures.

¶44    McBride argues that *Mimms* and *Wilson* do not apply in this case because those cases involved roadside stops whereas here the SUV was parked in an alley. He then argues that the Court's concern in those cases "was the hazards and danger to police investigating a traffic violation on a roadway." He asserts that in contrast here, the police encounter with McBride did not occur during a

---

[6] *Pennsylvania v. Mimms*, 434 U.S. 106 (1977) (per curiam).

[7] *Maryland v. Wilson*, 519 U.S. 408 (1997).

9

roadside stop, but rather, when an officer shined a spotlight into a parked SUV in an alley. Without citing any authority, he then argues that his removal from the SUV exceeded the *Terry* stop. In his reply brief, again without citing any authority, McBride merely asserts that "[t]his court should reject the State's bold invitation to extend the *per se* rule applicable to traffic stops in *Mimms* and *Wilson* to non-moving encounters." Also, without citing any authority, McBride argues that this court should narrowly interpret *Mimms* and *Wilson*, as applying only to roadside stops.

¶45    However, in *Johnson*, the U.S. Supreme Court stated that "the Court has recognized that traffic stops are 'especially fraught with danger to police officers.' 'The risk of harm to both the police and the occupants [of a stopped vehicle] is minimized,' we have stressed, 'if the officers routinely exercise unquestioned command of the situation.'" *Johnson*, 555 U.S. at 330 (alteration in original; citations omitted).

¶46    The Court then stated that its decisions in *Mimms*, *Wilson*, and *Brendlin* cumulatively portray *Terry*'s application in a traffic-stop setting. It explained that in *Mimms*, "the Court held that 'once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures'" and that "[t]he government's 'legitimate and weighty' interest in officer safety, the Court said, outweighs the '*de minimis*' additional intrusion of requiring a driver, already lawfully stopped, to exit the vehicle." *Johnson*, 555 U.S. at 331 (citations omitted).

¶47    The Court then stated that in *Wilson*, the Court held that "the *Mimms* rule applied to passengers as well as to drivers," that "[s]pecifically, the

10

Court instructed that 'an officer making a traffic stop may order passengers to get out of the car pending completion of the stop," and that it observed that "[t]he same weighty interest in officer safety … is present regardless of whether the occupant of the stopped car is the driver or passenger." *Johnson*, 555 U.S. at 331 (citations omitted). The Court then stated that the *Wilson* Court "emphasized, the risk of a violent encounter in a traffic-stop setting 'stems not from the ordinary reaction of a motorist stopped for a speeding violation, but from the fact that evidence of a more serious crime might be uncovered during the stop.'" *Johnson*, 555 U.S. at 331 (citation omitted). Finally, the Court stated that "[t]he motivation of a passenger to employ violence to prevent apprehension of such a crime … is every bit as great as that of the driver." *Id.* at 331-32 (citation omitted).[8]

¶48    Based on the holdings in those decisions, I conclude that because the police officers had reasonable suspicion that the parked SUV was violating a traffic ordinance, they could conduct an investigative stop of the SUV based on that noncriminal violation. They could also seize the occupants of the SUV during the investigative stop and could order McBride and the driver to exit the SUV without violating the Fourth Amendment's prohibition against unreasonable seizures. Moreover, when officers engage in a lawful traffic stop of a vehicle, they need not have cause to believe that any occupant of the vehicle is involved in

---

[8] The *Johnson* Court also stated, "Completing the picture, *Brendlin* held that a passenger is seized, just as the driver is, 'from the moment [a car stopped by the police comes] to a halt on the side of the road.'" *Arizona v. Johnson*, 555 U.S. 323, 332 (2009) (citation omitted).

criminal activity to engage in an investigation of the traffic violation and to order the occupants to exit the vehicle. *See **Johnson***, 555 U.S. at 331.[9]

### Probable Cause to Arrest and Search Incident to Arrest

¶49 The next issue that I address is whether the officers had probable cause to arrest McBride and search his person at the time when Officer Rivera opened the car door and immediately observed the orange pill bottle, without a label on it and with green pills in it, which he believed were oxycodone. I conclude that he did based on the totality of the circumstances.

¶50 In order to be lawful, an arrest must be based on probable cause. ***State v. Secrist***, 224 Wis. 2d 201, 212, 589 N.W.2d 387 (1999). Probable cause to arrest is the sum of evidence "within the arresting officer's knowledge at the time of the arrest which would lead a reasonable police officer to believe that the defendant probably committed or was committing a crime." ***Id.*** While the

---

[9] I note that McBride asserts that his seizure was not a "de minimis" additional intrusion occurring during a roadside traffic stop. He argues that to the contrary, rather than a traffic stop, his seizure was the whole point of the encounter. It appears that McBride is arguing that the traffic stop was a pretext and that Officer Rivera actually believed that the occupants of the SUV may be engaged in some other illegal behavior. He seems to be arguing that where a police officer subjectively believes that the occupants of an automobile may be engaging in some other illegal behavior the traffic stop is unlawful. First, his cites no authority for such an argument, and second, he is wrong.

In ***Whren v. United States***, 517 U.S. 806, 813 (1996), stated that "[i]n ***United States v. Robinson***, [414 U.S. 218] (1973), we held that a traffic-violation arrest (of the sort here) would not be rendered invalid by the fact that it was 'a mere pretext for a narcotics search ….'" Referring to other cases cited in the decision, the Court stated that "[w]e think these cases foreclose any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved." ***Id.*** In other words, regardless of whether a police officer subjectively believes that the occupants of an automobile may be engaging in some other illegal behavior, a traffic stop is permissible as long as a reasonable officer in the same circumstances *could have* stopped the car for the suspected traffic violation.

information must be sufficient to lead a reasonable officer to believe that the defendant's involvement in a crime is "more that a possibility," it "need not reach the level of proof beyond a reasonable doubt or even that guilt is more likely than not." *Id.* "The question of probable cause must be assessed on a case-by-case basis, looking at the totality of the circumstances. Probable cause is a 'flexible, common-sense measure of the plausibility of particular conclusions about human behavior.'" *State v. Lange*, 2009 WI 49, ¶20, 317 Wis. 2d 383, 766 N.W.2d 551 (citation and footnote omitted). "In determining whether there is probable cause, the court applies an objective standard, considering the information available to the officer and the officer's training and experience." *Id.* "When a police officer is confronted with two reasonable competing inferences, one justifying arrest and the other not, the officer is entitled to rely on the reasonable inference justifying arrest." *State v. Kutz*, 2003 WI App 205, ¶12, 267 Wis. 2d 531, 671 N.W.2d 660.

¶51 McBride asserts that Officer Rivera lacked probable cause to arrest him for the unlawful possession of a prescription drug "based simply upon the unlabeled pill bottle in the vehicle." However, as noted above, the question of probable cause must be assessed on a case-by-case basis, looking at the totality of the circumstances, not just one fact.

¶52 In this case, Officer Rivera—who had almost twelve years of experience as a City of Milwaukee police officer—and his partner were patrolling in a high-crime area. He had been patrolling that area for approximately five years. He testified that he had responded to many calls for service in the area regarding shootings, shots fired, drug dealing, and things of that nature. He personally made over two dozen arrests regarding illegal drugs and firearm possession in that area.

13

¶53     At approximately 11:15 p.m. on the night in question, Officer Rivera and his partner were patrolling in an alley looking for suspicious activity. While patrolling in the alley, he saw a SUV parked in the alley with no lights on. He testified that alleys in Milwaukee are typically very narrow, so the SUV caught his attention because it was not parked off to the side—it was parked right in the alley. As noted above, the circuit court found that the SUV was illegally parked, was parked in the middle of the alley, and was obstructing traffic. We must accept the circuit court's findings of historical fact unless they are clearly erroneous. *Genous*, 397 Wis. 2d 293, ¶10. Officer Rivera further testified that to him "with it being dark out, the lights being off in the SUV, with people inside the SUV parked in an alley obstructing traffic, that was not normal, especially in a high-crime area which made him suspicious."

¶54     Officer Rivera explained that because it was dark out and the SUV did not have any lights on he could not tell if anyone was inside the SUV, and therefore, he shined his squad car spotlight at the SUV. When he shined the spotlight on the SUV, he could see that there were two people in the car, and he could see that McBride immediately started to bend down towards his waist area and began to reach around in the SUV. Officer McBride testified that based upon his experience and training in dealing with similar situations, McBride's movements were consistent with someone having illegal narcotics or weapons on their person. He also stated that in his experience he had arrested people who had hidden controlled substances and weapons in their waistbands. In determining whether probable cause exists, this "court is to consider the information available to the officer from the standpoint of one versed in law enforcement, taking the officer's training and experience into account." *Kutz*, 267 Wis. 2d 531, ¶12. "[A] trained officer draws inferences and makes deductions ... that might well elude an

untrained person." ***Genous***, 397 Wis. 2d 293, ¶8 (alteration in original; citation omitted).

¶55 As Officer Rivera got out of the squad car, he saw that McBride was still making those furtive movements, so he ordered McBride and the driver to show him their hands. As he approached the SUV, Officer Rivera was asking McBride what he was reaching for—why he was reaching. When he reached the passenger door, Officer Rivera opened the door. When he opened the door, he immediately saw an orange pill bottle, without a label on it and that contained several green pills, between McBride's seat and the passenger door. Based on his training and experience, Officer Rivera believed the pills were oxycodone, that a pill bottle without a label was indicative that McBride was possessing a controlled substance without a prescription, and that when people normally carry prescription bottles, they have a label with their name on it, and that there was no label on the pill bottle in the SUV. When the trial court asked Officer Rivera if he immediately saw that the pill bottle contained green pills, Officer Rivera responded yes.

¶56 Here, the facts involve much more than a pill bottle, without a label, with green pills in it. Based upon the following facts discussed above, I conclude that probable cause existed for Officer Rivera to arrest McBride for possession of a controlled substance without a prescription at the time he opened the car door and saw the orange pill bottle, without a label and with green pills in it that he believed were oxycodone: (1) the stop occurred late at night; (2) in a high-crime area involving drug trafficking; (3) the SUV was parked in a dark alley obstructing traffic; (4) there were two people sitting in the car with the lights out; (5) when

Officer Rivera shined the squad spotlight on the SUV, McBride immediately began to make the furtive movements described above;[10] (6) when Officer Rivera opened the car door, he immediately saw the pill bottle on the floor of the SUV and it did not have a label on it; (7) the fact that the pill bottle was located on the floor of the SUV between the passenger seat and the passenger door was consistent with McBride's furtive movements leaning down toward his waist and consistent with someone hiding contraband;[11] (8) the circuit court's finding that there is "a fair inference that people don't drive around in their cars with pill bottles on the floor board or in between the door and the passenger seat, that there was actually something that was related to the furtive movement"; (9) that McBride continued to make the furtive movements as Officer McBride was getting out of the squad car; and (10) the pill bottle had green pills in it, that based on his training and experience Officer Rivera believed were oxycodone.

¶57    While the information must be sufficient to lead a reasonable officer to believe that the defendant's involvement in a crime is "more than a possibility," it "need not reach the level of proof beyond a reasonable doubt or even that guilt is

---

[10] In its decision, the Majority discusses McBride's movements. It notes that according to Officer Rivera, McBride immediately started to reach down towards his waist area and begin to reach around in the SUV. It then notes the Officer Rivera admitted, however, that neither his body cam nor his partner's body cam captured any movement from McBride. It then notes that Officer Rivera explained that this was because the body cam was at a fixed angle. Majority, ¶2. Later, the Majority states that Officer Rivera admitted that neither his body cam, nor his partner's captured any movement from McBride. It then states that they did not discern any movement based on its review of the body camera recording. To the extent that the Majority is questioning the credibility of Officer Rivera's testimony that he saw McBride make those movements, the circuit court made extensive findings about why it found Officer Rivera credible about the movements. We must accept the circuit court's findings of historical fact unless they are clearly erroneous. *Genous*, 397 Wis. 2d 293, ¶10.

[11] The circuit stated that "specifically that the bending down at the waist and putting one['s] hands in the waistband and the moving around was consistent with the hiding or retrieving of a weapon and … of a contraband."

more likely than not." ***Secrist***, 224 Wis. 2d at 212. "The question of probable cause must be assessed on a case-by-case basis, looking at the totality of the circumstances. Probable cause is a 'flexible, common-sense measure of the plausibility of particular conclusions about human behavior.'" ***Lange***, 317 Wis. 2d 383, ¶20 (citation and footnote omitted). "In determining whether there is probable cause, the court applies an objective standard, considering the information available to the officer and the officer's training and experience." ***Id.*** "When a police officer is confronted with two reasonable competing inferences, one justifying arrest and the other not, the officer is entitled to rely on the reasonable inference justifying arrest." ***Kutz***, 267 Wis. 2d 531, ¶12.

¶58 Thus, I conclude that probable cause existed to arrest McBride before Officer Rivera searched him.

### Search Incident to the Lawful Arrest

¶59 The last issue that I address is whether Officer Rivera's search of McBride was incident to his arrest. The State notes that the record is unclear when the arrest occurred, though it states that it appears that it occurred after Officer Rivera searched McBride. Therefore, the State assumes that the arrest happened after the search. I will do the same.

¶60 The State argues that the fact that the arrest occurred after the search is not dispositive as to whether a search is one incident to a lawful arrest. In ***Rawlings v. Kentucky***, 448 U.S. 98, 111 (1980), the Court held that "[w]here the formal arrest followed quickly on the heels of the challenged search …, we do not believe it particularly important that the search preceded the arrest rather than vice versa." In ***State v. Sykes***, 2005 WI 48, ¶15, 279 Wis. 2d 742, 695 N.W.2d 277 (alteration in original; citation omitted), our supreme court held that "[a] search

may be incident to a subsequent arrest if the officers have probable cause to arrest before the search." "Accordingly, when a suspect is arrested subsequent to a search, the legality of the search is established by the officer's possession, before the search, of facts sufficient to establish probable cause to arrest followed by a contemporaneous arrest." *Id.*, ¶16.

¶61 McBride acknowledges that a search incident to arrest is a lawful exception to the warrant requirement. Further, he does not argue that an arrest subsequent to a search is unlawful even if the officers had probable cause to arrest before the search. What he argues is that there was no probable cause to arrest him for possession of a prescription drug based simply on the unlabeled pill bottle in the SUV, and therefore, Officer Rivera lacked authority to search McBride incident to an arrest.

¶62 Because I concluded above that the unlabeled pill bottle was not the only factual basis supporting probable cause, I reject McBride's argument. Thus, I conclude that the search of McBride was incident to his lawful arrest, and therefore, the drugs found on him were lawfully recovered.

## Conclusion

¶63 Based on the totality of the circumstances, I conclude that: (1) the police officers had reasonable suspicion to stop the SUV McBride was a passenger in because the SUV was illegally parked obstructing traffic; (2) McBride was lawfully seized during the investigative stop for the traffic violation; (3) the officers lawfully ordered McBride to exit the SUV during the investigative stop; (4) under the totality of the circumstances, at the time Officer Rivera opened the car door and immediately saw the pill bottle that did not have a label on it and contained green pills that Officer Rivera believed were oxycodone, the officers

had probable cause to arrest McBride for possession of a controlled substance without a prescription; and (5) and the officers' search of McBride was incident to the lawful arrest.

¶64     Thus I would affirm, and I respectfully dissent.